section 3585(b). An appropriate order is attached.

## ORDER

For the reasons stated in the preceding Memorandum, it is hereby

**ORDERED** that the government's motion to correct judgment is **DENIED.**

Robert **KING**, Karen King, Individually and as Next Friend of Mark King, a Minor

v.

**BOARD OF EDUCATION OF ALLEGANY COUNTY, MARYLAND.**

No. CIV. A. S 97–421.

United States District Court, D. Maryland.

April 24, 1998.

Conrad W. Varner, Varner & Kaslick, Frederick, MD, for Plaintiffs.

Rochelle S. Eisenberg, Edmund J. O'Meally, Blum, Yumkas, Mailman, Gutman & Denick, P.A., Baltimore, MD, David B. Consiglio, Andrews and Wagner, Altoona, PA, for Defendants.

### ORDER AND JUDGMENT

SMALKIN, District Judge.

The plaintiffs, not having timely filed any objection to the Report and Recommendation of Magistrate Judge Grimm entered herein March 27, 1998, and the defendant's objection having been filed only in the event the Court would reject the Magistrate Judge's Report and Recommendation, it is, by the Court, this 24th day of April, 1998, ORDERED and ADJUDGED:

1. That the Magistrate Judge's Report and Recommendation BE, and the same hereby IS, ADOPTED;

2. That the defendant's motion for summary judgment BE, and it hereby IS, GRANTED;

3. That the plaintiffs' motion for summary judgment BE, and it hereby IS, DENIED:

4. That plaintiffs' request for leave to file an additional report BE, and it hereby IS, DENIED:

5. That defendant's motion to reconsider the exclusion of additional evidence BE, and it hereby IS, DENIED;

6. That judgment BE, and it hereby IS, entered in favor of the defendant and against the plaintiffs, as to all counts, with each party to bear its own costs;

7. That this case BE, and it hereby IS, CLOSED; and

8. That the Clerk of Court mail copies hereof to counsel for the parties and to Magistrate Judge Grimm.

### REPORT AND RECOMMENDATION

March 23, 1998.

GRIMM, United States Magistrate Judge.

Plaintiffs Robert and Karen King have sued the Board of Education of Allegany County (ACSB), alleging, in substance, that their eight-year-old son, Mark, has been denied a free appropriate public education in violation of the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. § 1400, and the Rehabilitation Act of 1973, 29 U.S.C. § 794. By Order dated June 19, 1997, the Court denied without prejudice the defendant's motion to dismiss these claims, so that the parties could submit additional documentary evidence pursuant to 20 U.S.C. § 1415(e)(2).[1] (Paper No. 20). Both parties have since submitted additional evidence in support of their positions, and now pending are the parties' cross-motions for summary judgment, briefed in papers 22 through 25. Having heard the argument of counsel on February 24, 1998, and upon consideration of the parties' additional evidence and written submissions, I recommend that the plaintiffs' motion be denied and that the defendant's motion be granted. Also pending are the defendant's motion to reconsider this Court's Order allowing the submission of additional evidence (Paper Nos. 28 and 29), and the plaintiffs' request for leave to file an additional report (Paper No. 29 at 5). I recommend that these motions be denied.

### A. Summary of the Additional Evidence Submitted by the Parties

1. *Plaintiffs' Additional Evidence*

The following exhibits were submitted as additional evidence in support of the plaintiffs' supplemental answer to the defendant's motion for summary judgment (Paper No. 15): King Exhibit F, a Learning Accomplish-

ment Profile ("LAP") dated May 1997; King Exhibit G, an affidavit from Mark's father, dated July 25, 1997; King Exhibit H, an affidavit from Dr. Corinne Jensema,[2] dated July 28, 1997, which itself contains 4 exhibits; and King Exhibit I, an affidavit from Jane McBride, Ph.D., the principal of the West Virginia School for the Deaf and Blind ("WVSDB") which authenticates three exhibits: an Individual Education Plan ("IEP") for Mark dated May 6, 1996, the LAP regarding Mark's progress at WVSDB, dated May 16, 1997, and his April 11, 1997 IEP for the WVSDB. Relevant portions of these exhibits will be discussed in further detail below.

King Exhibit F contains Mark's LAP from the WVSDB. This exhibit, dated May 16, 1997, was prepared by Ms. Janet Kesnser, Mark's classroom teacher. The LAP reports a comparison of Mark's performance on April 14, 1996 and May 8, 1997, with respect to various fine motor manipulation, cognitive matching, cognitive counting, language/cognitive naming, language/cognitive comprehension, gross motor (body movement), gross motor (object movement), and self-help (eating, dressing, grooming, toileting, and self-direction) tests. The summary sheet for this exhibit states:

> Mark showed a definite improvement on this test. His developmental age (DA) centered around 36 months with a DA of 48 months on cognitive: matching and self-help: toileting and a DA of 42 months on self-help: grooming. His former test scores reflected a DA of 24 months or less, with a DA of 36 months in self-help: toileting and grooming. Mark's raw score for the total test nearly doubled from 83 in April 1996 to 162 in May 1997.

(King Exhibit F at 1).

King Exhibit G is an affidavit from Mark's father, Robert King, commenting on his observations of Mark since his enrollment in WVSDB. Mr. King states that, at the school, Mark's hearing aids are cleaned and checked

---

1. The Court, however, granted the defendant's motion to dismiss Count III of the plaintiffs' Amended Complaint which alleged violations of 42 U.S.C. § 1983. (Paper No. 20).

2. *See* pages 52–55 of the Report and Recommendation previously issued in this case, dated May 30, 1997 (Paper No. 17), for a description of Dr. Jensema's qualifications and a summary of her opinions with respect to Mark's educational needs.

daily, and he has his own FM system to amplify his hearing aids. He reports that Mark can "initialize" approximately 100 signs and respond to approximately 100–200. In addition, Mr. King says that Mark can read eight words and sign "stop, go, in, out, up, down, on, and off." He states that Mark's speech has improved, as has his eating behavior, although he is still quite selective about what he will eat. Mr. King states that Mark is in a class with three other children, one teacher and one aide. He states that "homework" is sent home each day for Mark, and parental training also is provided.

King Exhibit H is an affidavit from Dr. Jensema, dated July 28, 1997, with three exhibits. The first is her CV, which was previously summarized in the Report and Recommendation issued by this Court on May 30, 1997. (King Exhibit H at 5–14). The second exhibit is her report, dated April 29, 1997, which summarizes her opinions about Mark's educational needs. (King Exhibit H.1 at 1). Although also summarized in the previous Report and Recommendation, this report merits additional discussion.

Dr. Jensema states that she first became involved with Mark in the spring of 1996. She met with Mark and his family, observed the program at Cash Valley Elementary School where he was placed by the defendant, and observed Mark at school at the WVSDB. In addition, she conducted a review of Mark's case. The essence of her opinion is that despite the fact that Mark's hearing impairment was discovered before he was even one month old,[3] the Allegany County Public Schools ("ACPS") reacted too slowly to his needs for individualized audiological services. She noted that it was not until February 1991 that Mark received speech and language consultations every six months, and not until May 1993 before he received direct speech and language therapy, and February 1994 before he received three days per week of instructional services. Dr. Jensema also was critical of the fact that Mark did not begin to receive audiological services until September 1994, and that the ACPS had not implemented the recommendations of Mark's audiologist, Dr. Resnick.

She further noted that it was not until January 1995 that the defendant involved the Maryland School for the Deaf in assessing Mark's needs. She attributed the fact that Mark's testing showed only a four month improvement in speech and language development over a three year period to the failure of the ACPS to properly address Mark's learning needs.

Dr. Jensema discussed the significance of the delay in Mark receiving the services she believed he needed. She expressed the view that a hearing impairment deprives a child of the most important avenue by which oral communication is established. This is significant because the ability of a child to quickly assimilate rules of language "dramatically" decreases as age increases. Thus, a failure to introduce a child with a hearing impairment to language for a several year period in early life means that he or she will learn language at a much slower rate. In Mark's case, she believed that the failure to provide him with early instruction in visual access to language, as well as audiological services, had a profound negative impact on his cognitive development. When combined with the fact that Mark has Downs syndrome, a form of mental retardation which leaves him with an IQ of roughly 50 percent of a normal child, his ability to communicate his thoughts, and, indeed, his thought process itself, will be very limited.

In her affidavit, Dr. Jensema discussed the difference between teaching a hearing impaired child American Sign Language ("ASL") and "speech supported by sign." ASL does not follow spoken English word order, but instead has its own rules of grammar, syntax and semantics, which are influenced by "subtleties" such as "arching of the eyebrows, placement of the tongue, and rate of sign production." She noted that every English word does not have a corresponding sign, and every sign does not have a corresponding English word. In contrast, when children are placed in classes where they are taught speech supported by sign, as was proposed for Mark at Cash Valley, normal English word order, syntax and semantics

---

3. Mark was born on July 31, 1989.

are used for the signs which are taught. However, because the instruction depends upon spoken word communication as well as use of sign, a child with a hearing impairment such as Mark may miss important spoken communication which the non-hearing impaired children receive. It was Dr. Jensema's belief that the "speech supported by sign" approach which was proposed for Mark at Cash Valley was therefore not appropriate for his needs.

Dr. Jensema compared Mark's program at WVSDB with the program proposed for him at Cash Valley, and identified 12 areas in which Mark's performance had improved since transferring to WVSDB. While she noted that there were similarities between the Cash Valley program and the WVSDB program, she pointed out that the "dramatic difference" between the two was the fact that at Cash Valley the children who would be in class with Mark were much lower functioning than those in his class at WVSDB. Further, because many of the Cash Valley students also had disruptive behavioral problems, the teaching aides were required to spend a great deal of time just to keep order in the class. In contrast, she described the class at WVSDB as "upbeat" in atmosphere, and characterized by natural conversations between staff and students, and an absence of behavioral problems. Dr. Jensema concluded her report as follows:

There can be little dispute that the lack of appropriate educational intervention for Mark King during the first few years of his life has had a profound impact on his ability to learn and use language, improve behaviors, and acquire cognitive skills that are best related through language. Mark must be in a full time program for other children with hearing impairments and multiple disabilities that can provide him with a language-rich curriculum relayed primarily through ASL, supervision and maintenance of his audiological needs, behavioral programming, and peers who can afford him models for language and behavior. At the current time, the program at Cash Valley is not able to provide him with these, and in fact has demonstrated a reluctance until most recently to provide him with comprehensive, intensive instruction and intervention. Mark needs a program of special education and related services such as that currently being provided by the WVSD[B].

(King Exhibit H.2 at 7).

Exhibit 3 to King Exhibit H is another copy of the May 1997 LAP for Mark, and the fourth exhibit is an addendum to Dr. Jensema's opinion, commenting on the LAP. She notes:

[n]ot only is there evidence of progress in the year's time that he has been at the West Virginia School for the Deaf, but there is marked improvement over his performance when he was a student at Cash Valley. Particular progress is noteworthy in the areas of fine motor: manipulation, cognitive: matching, language/cognitive: naming, language/cognitive: comprehension, and self-help: dressing. I am very gratified to see that he is becoming more self-sufficient, is developing basic concepts, and now has language in which to express his thoughts and desires. The benefit that Mark has reaped from his current placement is uncontrovertible.

(King Exhibit H.4 at 1).

The final exhibit submitted by the plaintiffs is King Exhibit I, an affidavit from the principal of the WVSDB authenticating three exhibits: Mark's current IEP at the school, the LAP of Mark, prepared in May 1997 and discussed above, and Mark's educational performance assessment.

The clear thrust of the additional evidence submitted by the plaintiffs is that, more than any other factor, Mark's hearing impairment has had the most inimical impact on his ability to learn to communicate. It further is their position that, as a consequence of the delay in providing Mark with personalized audiological services and instruction in nonverbal means of communication, his cognitive and communicative ability have not developed commensurate with his intelligence, even though that is limited by his having Downs syndrome. The conclusion which the plaintiffs reach is that only by placing Mark in a learning environment which teaches him an alternative form of communication, ASL, in a class of hearing impaired students, will

he be able to learn to speak and develop cognitively to his fullest potential. Because, in the view of the plaintiffs, the Cash Valley program proposed for Mark does not propose to teach him ASL, and since not all of the students in his class would be hearing impaired, the Cash Valley program is fundamentally flawed as it relates to him, and only the WVSDB program will provide Mark with an education truly tailored to his needs. As next will be seen, the rebuttal evidence provided by the defendant reaches the opposite conclusion, as the defendant views Mark's primary problem as his mental retardation, caused by Downs syndrome. The defendant contends that the plaintiffs fail to properly take into account Mark's mental retardation when arguing that he must be taught to communicate through ASL. Moreover, the defendant does not agree that Mark's progress since he was enrolled in the WVSDB has been as impressive as the plaintiffs claim. Not surprisingly, the defendant accordingly concludes that the Cash Valley program proposed for Mark is best for him, and more than meets the requirements of the IDEA.

### 2. *Defendant's Additional Evidence*

The Allegany County School Board ("ACSB") submitted the following additional evidence as supplemental exhibits to their motion for summary judgment (Paper No. 7): ACSB Exhibit H, affidavit of Donald Rabush, Ph.D. (containing Exhibit 1, his CV and Exhibit 2, his report, dated September 19, 1997); ACSB Exhibit I, an affidavit of Ruth Howell, Ph.D. (containing Exhibit 1, her CV and Exhibit 2, her report dated September 19, 1997); and ACSB Exhibit J, an affidavit from Dr. Rabush authenticating a videotape recording of the classroom environment at the Cash Valley Elementary School, showing the classroom environment of the class where Mark would have been a student had he stayed at that school. The video was taken on June 6, 1996, is 21 minutes long, and is unedited. Also included is ACSB Exhibit K, an affidavit of Ms. Jane McBride, Superintendent of the WVSDB, authenticating Exhibits 1 and 2, "dissent sheets" submitted by Terry Gruber and Sheree Witt, who participated in the development of Mark's IEP at the WVSDB. This evidence is discussed more fully below. For ease of reference, the evidence will be referred to only by exhibit letter and number.

Dr. Robert Rabush was retained by ACSB as an expert witness. He holds a BA in English, a M.Ed. in special education, and a Ph.D. in special education with major emphasis in instruction of special education students, and a minor in hearing impaired education. (ACSB Exhibit H.1). Presently, he is a consultant in the area of management and education of the deaf. He has taught special education courses at Western Maryland College, and has served as a consultant/trainer at the Montana School for the Deaf, a language trainer at the Delaware School for the Deaf, and a consultant for the Maryland School for the Deaf. *Id.* He also has served as a hearing officer for the State of Maryland Department of Education and spoke on numerous occasions regarding educational issues involving speech acquisition by deaf and special education students, and published more than a dozen articles in his field. *Id.*

During his career, Dr. Rabush visited and/or evaluated special education programs in "virtually" every county in Maryland, as well as similar programs in Virginia, Pennsylvania, Delaware, and New Jersey. (ACSB Exhibit H.2). Additionally, he developed and taught all of the early multi-disability courses on deafness as the educational coordinator of the Western Maryland Program on Deafness. *Id.* On a personal note, Dr. Rabush states that he has a moderate hearing loss and wears binaural aids. *Id.*

Dr. Rabush first became involved in Mark's case in the spring of 1996, when he was referred by the Maryland School for the Deaf to the ACSB to evaluate the appropriateness of the Cash Valley Program for Mark. *Id.* He was asked to determine whether the Cash Valley program and services were appropriate for Mark, whether the IEP which had been developed for Mark could be delivered at Cash Valley, and whether this would be the most appropriate program for Mark, in the least restrictive environment. *Id.* In preparation, Dr. Rabush visited Cash Valley on three occasions during June of

1996 to view the program where Mark was then enrolled. *Id.* at 2. During his visits, he spent approximately two to three hours with Mark, evaluating his functional abilities. *Id.* On his third visit to Cash Valley, Dr. Rabush videotaped the program proposed for Mark, in order to demonstrate the appropriateness of the peer groupings in Mark's class as well as to demonstrate the "Total Communication" environment in the class, which included the use of sign language by the teacher and teaching aides. *Id.* The videotape has been filed as part of the record in this Court.

It was Dr. Rabush's opinion that the Cash Valley program was "an outstanding example of what mainstream education should be," because it grouped six children with similar cognitive abilities who were functioning in the same range of abilities in a "very supportive Total Communication environment that used an FM system to enhance the level of vocal input." *Id.* He concluded that the Cash Valley program "certainly could have delivered the IEP that was written for Mark in 1995–6." *Id.*

Dr. Rabush returned to Cash Valley in September 1997, when he made an unannounced visit to the class he had previously visited (Mark, however, was no longer enrolled in Cash Valley). Dr. Rabush reported that he was pleased with the progress he had seen in the children since his visits in June 1996. *Id.* at 2–3. For reasons which will next be discussed, it was Dr. Rabush's opinion that Mark would be better served educationally by the Cash Valley program than that at WVSDB. He concluded that the Cash Valley program was the proper placement for Mark in the 95–96 school year, as well as for his current IEP. *Id.* at 3. Central to his opinion is the significance he attaches to the fact that Mark has Downs syndrome. *Id.* As will be seen, from Dr. Rabush's perspective, the most significant aspect of Mark's condition is his cognitive disability; his hearing impairment is viewed as a "further complication." *Id.* Dr. Rabush's entire opinion is distilled in the following section of his report:

> Mental Retardation is Mark's primary educational consideration; the hearing impairment is an *additional* concern for acquisi-

tion of language and learning. Language programming that works for deaf youngsters, i.e. American Sign Language ["ASL"], will not work with an individual with moderate to severe mental retardation. There is no empirical research that supports the view that ASL can be acquired as a communication tool with this population. There is, however, evidence to support teaching moderately to severely retarded persons sign language in a "Total Communication" environment if we understand the impact of the retardation and make provisions for it. I have never met a moderately retarded youngster who can communicate in ASL; his cognitive capabilities preclude the possibility. Therefore, I don't believe that Mark will ever be able to communicate effectively in ASL with his deaf peers. As Mark grows into adulthood, he will have many more opportunities to live and work in a hearing environment with persons who may understand signed English, or gesturally based signs. This should be a major consideration for his educational program: where will he be 15 years from now, with whom will he need to communicate, and in what environment.

*Id.* at 4 (emphasis in original).

Dr. Rabush did not deny Mark's hearing loss, but observed that because of the difficulty in testing him, there was no definitive data regarding the extent of this loss. (ACSB Exhibit H.2. at 4–5). He also took issue with Dr. Jensema's criticism of the ACSB for not having earlier intervened to provide Mark with services for his hearing impairment, observing that Mark's moderate to severe mental retardation, combined with his behavioral problems, his vision and other health problems and difficulty in testing, when considered along with the inconsistent results of the hearing tests done on him, justified the approach taken by the ACSB. *Id.* at 6.

As a result of Mark's multiple conditions, Dr. Rabush concluded that he needs to be placed in a setting where he is taught by special education teachers, not deaf education teachers. *Id.* at 7–8. Focusing on the videotape he took of Mark's class at Cash Valley

in June 1996, he noted the following six factors which he felt made the classroom atmosphere and environment "superb": (1) the comparable IQ and age level of the students; (2) the consistent use of Total Communication, which includes sign; (3) the quality of the instruction and the caring nature of the teacher and aides; (4) the teacher-student ratio; (5) the use of an FM amplification system for the benefit of Mark and one other student who also was hearing impaired; and (6) the physical surroundings. *Id.* at 8. He added that, based on the level of cognitive function of the students in Mark's class, it would be proper to develop a signed vocabulary for teaching, using an English, not ASL, vocabulary. *Id.*

Finally, Dr. Rabush responded to the addendum to Dr. Jensema's report, in which she interpreted the results of the LAP prepared by the WVSDB regarding Mark's progress. Dr. Rabush noted that the LAP is a "non-standardized, criterion-referenced test," which was administered by Mark's classroom teacher. *Id.* at 9. Dr. Rabush questioned whether the results of the LAP could be considered valid. *Id.* Additionally, he noted that the first LAP test which was performed on Mark by the WVSDB in May 1996, occurred at a time when Mark's behavioral problems were uncontrollable. If this was the case when he was given the first LAP, then Dr. Rabush questioned whether the results of the earlier test could be considered as a valid baseline for comparison against Mark's performance more than a year later, when the second LAP was performed. *Id.* Dr. Rabush concluded his report as follows:

> It is my professional opinion that the Cash Valley program I visited could have delivered the IEP written for Mark King during the 1995–1996 school year and in fact would be a better place for him in the future because it is the least restrictive environment. Mark's hearing loss does not really include him in the deafness world and his mental retardation excludes him from it. If Mark's primary disability was hearing impairment and his additional

problems were not as severe, I could agree that the WVSD[B] might be an appropriate placement. The reality is, however, that Mark is moderately cognitively impaired and his peers in the future will be youngsters who are mentally retarded. Placing this youngster in the school for the deaf is not only less appropriate it is also isolating him from his future.

*Id.* at 10.

ACSB Exhibit I.1. to Paper No. 7 is an affidavit from Ruth Howell, Ph.D.[4] This affidavit briefly recaps her involvement in the case, summarizes the written materials she reviewed, her observations of Mark, her participation in the local level administrative hearing, and states her opinion that the IEP develop for Mark by the ACSB is an appropriate program which meets Mark's educational and special educational needs. In her opinion, Mark did receive educational benefits from that program while enrolled in it, and likely would have continued to receive educational benefits from the program had he remained in it. (ACSB Exhibit I.1 at 1–2). Additionally, her affidavit incorporates by reference her supplemental written report, dated September 19, 1997, which was attached as ACSB Exhibit I.2.

In her report, Dr. Howell states that she had reviewed all of the additional evidence submitted by the plaintiffs, as well as viewed the videotape prepared by Dr. Rabush in June of 1996. She further reviewed all of Mark's underlying file, as well as the documents related to the local and state administrative hearings. ACSB Exhibit I.2 at page 1. She commenced her report with a note of clarification regarding her relationship with the Allegany County School System. She stated that the ACSB and the Maryland School for the Deaf ("MSD") have, since 1992, had in place an interagency agreement which sets out the responsibilities of each of these organizations with respect to providing special education services to Allegany County students. Under that agreement, her responsibility, as a representative of MSD, is to

---

**4.** Dr. Howell testified as a witness on behalf of the defendant at the administrative hearings regarding Mark. Her qualifications and testimony are summarized at pages 37–41 of the May 30, 1997 Report and Recommendation previously issued in this case. (Paper No. 17).

oversee and provide consultation and support to Allegany County regarding the satellite class at Cash Valley Elementary School, as well as to assist the county with other issues relating to deaf and hard-of-hearing students. Evidently responding to efforts by the plaintiffs to impeach her credibility during the local level administrative hearing, she asserted that her involvement as an expert in this case is a "direct" response based on her job duties at MSD, and she emphatically stated that she was not retained or reimbursed by ACSB for her efforts in Mark's case. *Id.* at 1. Accordingly, she stresses, all of her comments in her written report should be viewed as a function of her role as the MSD liaison to the ACSB to implement the interagency agreement. *Id.*

Before stating her opinions and the supporting bases, Dr. Howell spent some time highlighting her past experience as a teacher of hearing disabled students. She began her teaching career at the MSD in Frederick as a teacher in the preschool-parent counseling program, which required her to make home visits to families throughout the State of Maryland to help them develop plans to care for and educate deaf children. *Id.* at 2. Accordingly, she stated, she has had more than 25 years experience dealing with the impact of deafness on children and their families. *Id.* Dr. Howell stressed that the goal of the preschool program always has been to "foster early language acquisition, to assist parents in acquiring appropriate services for their children...." *Id.* As part of the services she offered to families of deaf children, Dr. Howell and others in her program offered sign language instruction during home visits. *Id.* Additionally, she pointed out, she received more than 80 undergraduate and graduate credits in classes relating to deafness, linguistics, sign language, behavioral management, learning strategies, and methods of teaching. *Id.*

Dr. Howell further stated that, because she has deaf relatives, she personally has used sign language throughout her life, and she holds a comprehensive skills certificate (CSC) from the National Registry of Interpreters for the Deaf, which she has kept current since 1978. *Id.* As a holder of the

CSC certificate, Dr. Howell is qualified to transmit information using ASL expressively to deaf clients, and is proficient in translating what a deaf client says using ASL into English grammar and syntax. *Id.* She also is certified as an oral interpreter for deaf clients. She concludes "[i]n other words, my communication skills with deaf persons who use sign language or who depend primarily on oral communication are more than adequate to evaluate the communication used in a classroom setting." *Id.* She also noted that she had taught sign language for more than 20 years. *Id.* at 3.

Dr. Howell stated that after receiving her doctorate, she became the Director of the Family Education Early Intervention Department of the MSD, and has held this position for 12 years. *Id.* The focus of her program is to administer a statewide early intervention program for families with young deaf and hard of hearing children, from birth to age five. *Id.* The cornerstone of this program, she stated, is the emphasis on early language acquisition and literacy. *Id.* As a result of her experience, Dr. Howell expressed confidence in her ability to render opinions regarding "communication needs of deaf children and about the impact of hearing loss on the children and their families." *Id.* at 4.

Dr. Howell next turned her attention to her involvement with Mark King, noting that she began seeing Mark in 1994, as a result of a referral from Mark's audiologist, Dr. Steffi Resnick. *Id.* Although Mark was at that time older than five, she agreed to meet with the Kings to determine what services the MSD might be able to provide for Mark, through its interagency agreement with the ACSB. During the course of her evaluation of Mark, she observed him in his class at Cash Valley, met his teacher and occupational therapist, and met with Mark's parents. *Id.* When she met with Mr. King he advised her that he was not satisfied with Mark's education at Cash Valley, and wanted Mark transferred to the MSD satellite class. *Id.* Dr. Howell was doubtful about whether Mark could meet the admission requirements for the MSD, however, because that school requires its students to have an IQ of at least

52, and a bilateral hearing loss of at least 70 dB in the better ear. From her observations of Mark, she doubted whether he could meet these admissions requirements. *Id.* However, because Mark's parents never made an appointment for him to be evaluated, he never was considered for admission by MSD and, consequently, was never denied admission. *Id.*

As a result of her evaluation of Mark in late 1994, and early 1995, it was Dr. Howell's belief that Mark's primary disability was mental retardation, as a result of Downs syndrome. *Id.* She also noted his sensory defensiveness, which was significant because, within the deaf community, people often initiate conversation by touching another to get their attention, and she had concerns that placing Mark in a class of other deaf children would create a stressful environment for him. *Id.* at 4–5. What Dr. Howell did offer Mark's parents was biweekly sessions with two family education/early intervention department family educators, one of whom had a degree in deaf education, and the other, a counselor, was herself deaf. *Id.* at 5. Dr. Howell proposed that these teachers assist the Kings in developing their sign language skills and to set-up routines for Mark at home to develop his ability to express his needs and wants more formally, and in a socially acceptable manner. *Id.* The family educators did meet with the Kings during the winter and spring of 1995, and kept Dr. Howell informed of their progress with Mark and his parents.

Dr. Howell attended a meeting to review Mark's IEP in July 1995. At that meeting, there was an extensive discussion about the exact nature of Mark's hearing impairment, and Dr. Howell expressed her observations that there was contradictory information about Mark's response to environmental sounds. Dr. Howell again observed Mark in his class at Cash Valley during September of 1995, during which time she saw him interact with his speech therapist by responding to instructions she gave using only her voice. *Id.* As a result of her observation of Mark, Dr. Howell concluded that he had "usable auditory skills," at least in 1995. *Id.* Finally, Dr. Howell noted that she visited the WVSDB in October 1995, to familiarize herself with the services which would be provided to Mark if he were enrolled there. *Id.*

Dr. Howell next discussed the factors which she considered significant in connection with Mark's educational needs. She observed that the "entire premise" of the Kings' efforts to have Mark placed in a class for deaf children rests on the assumption that Mark is deaf. *Id.* However, based on Dr. Howell's review of Mark's entire record, her observations of him at home and at class, and her participation in the administrative hearing process regarding Mark's IEP, she still questioned the degree of Mark's hearing loss. *Id.* Although she readily acknowledged the fact that Mark has some level of hearing loss, she concluded that it may be "mixed" (i.e. both sensorineural and conductive), which means that it very difficult to determine the exact degree of hearing loss. *Id.* at 6. When this factor is considered along with Mark's cognitive disability, a history of ear infections and treatment for other conditions affecting his ability to hear (tonsillectomy, adenoidectomy, pneumonia), she concluded that there are many factors in Mark's history which could mask the degree of his hearing loss. *Id.* She concluded "[i]t is entirely possible that Mark's hearing status has changed over the years and that he may have a progressive or fluctuating hearing loss due to his repeated bouts with otitis media [ear infections], upper respiratory infections, and pneumonia." *Id.*

Dr. Howell supported her conclusion with references to the hearing tests performed on Mark throughout his life, observing that initial tests showed that his right ear was within the normal limits, and that the results of tests conducted in 1994 were "clearly different" from the results of those done in 1989 and 1990. *Id.* at 7. Further, Dr. Howell pointed out that Mark's behavioral problems (particularly his sensitivity to being touched) have impeded the ability to accurately measure the true degree of his hearing loss. *Id.* As a result of all this, Dr. Howell believes that there is a question as to whether Mark should be enrolled in a school for the deaf without "definitive evaluation" of his audiological status. *Id.* She noted that Mark's

teacher at WVSDB also had observed him respond to environmental sounds, and concluded that the only way to definitively assess the nature of his hearing loss would be to have an updated auditory brain stem response (ABR) test performed, because this test is performed while the child is asleep, and consequently bypasses middle ear "issues" (infection, wax buildup) as well as behavioral problems. *Id.* Dr. Howell next evaluated the education program proposed for Mark by ACSB, and compared it with the WVSDB program developed for him.

Dr. Howell reviewed the IEP which the ACSB proposed for Mark in July 1995, and noted that among the goals it identified for his education was to improve his communication skills through the use of sign as well as spoken word. *Id.* at 8. In addition, the IEP had as goals the improvement of his behavioral, self-help, gross and fine motor and cognitive skills. *Id.* It also provided for audiological services which included monitoring the use of his hearing aids, daily audiological testing and reinforcement of his use of earphones. *Id.* Dr. Howell noted that "[t]he placement page specifically described a classroom where sign and oral communication would be used simultaneously. It also noted that he needed to be with peers with similar developmental levels." *Id.* Dr. Howell stated that when the above IEP was reviewed by the ACSB in April of 1996—a meeting which the Kings did not attend—progress in each of the goals which had been established for Mark had been noted, including: improvement in his behavior and gross and fine motor skills; improvement in his self-help skills in four of the six short term goals; cognitive skills were noted as "emerging"; and Mark's communication skills reflected that he maintained consistency in using signs he had previously acquired. Further, Dr. Howell observed that Mark was learning additional signs as of April 1996, which reflected his exposure to Total Communication (i.e., sign and speech simultaneously used), as well as his "willing acceptance" of his earphones. *Id.* at 8–9. Dr. Howell also noted that, during the April 1996 review of Mark's IEP, it was determined that his education would be "delivered in a special education class environment which provides 'a combina-

tion of sign/oral communication simultaneously with other forms of augmentative communication as well as having the presence of other children with similar developmental levels.'" *Id.* at 9. Additionally, Mark was to continue to have interaction with non-disabled peers. *Id.* Finally, Dr. Howell pointed out that Mark was to receive speech services from a certified speech pathologist, who had signing communication capability, and by a certified audiologist. *Id.*

Dr. Howell next compared the ACSB proposed IEP with the WVSDB IEP developed for Mark, noting that "the short term objectives under each category are very similar." *Id.* at 10. However, she noted, the Cash Valley program proposed for Mark would provide speech therapy five times per week for a total of 150 minutes, as compared to 60 minutes per week for the same services at WVSDB. *Id.* Similarly, at Cash Valley, Mark would receive formal audiological services, but not at WVSDB. Total hours of class time at the two programs were comparable, with Cash Valley proposing 22 hours per week, and WVSDB offering 27.5 hours per week. *Id.* WVSDB did not offer extended school year services, while Cash Valley did. *Id.* In short, following her review of both IEPs, Dr. Howell concluded "[t]hus, the IEPs are very similar in their choices of objectives and in their description of Mark's strengths and needs. Both IEP's address the need for Total Communication." *Id.*

Dr. Howell acknowledged that dissent had been voiced by one of the participant's in the committee which developed Mark's IEP at WVSDB. The WVSDB deaf-blind multihandicapped instructor, Mr. Gruber, dissented from the recommended IEP, contending that the educational staff working with Mark should have training in education of mentally impaired students and that teachers in schools for the deaf do not have this specialized training. *Id.* Dr. Howell agreed with the opinion expressed in Mr. Gruber's dissent. *Id.* at 11.

Dr. Howell also reviewed the Learning Accomplishment Profile (LAP), attached as plaintiffs' Supplemental Exhibit F. This test is designed to assess motor, cognitive, lan-

guage and activities of daily living. *Id.* Dr. Howell noted that the LAP had been administered between May 8–16, 1997, by Mark's classroom teacher, and that Mark's raw scores almost doubled as compared to the first time a LAP was administered to him the year before. She observed, however, that at the time the test was given to Mark, he was over 7 ½ years old, and the LAP is a test designed for infants and preschool children. *Id.* When the test was given to Mark after a full year at WVSDB, Dr. Howell pointed out that Mark still had received no scores above the 48 months age level, despite the fact that he had a chronological age at the time he took the test of 93 months. *Id.* Thus, Dr. Howell concluded that both Mark's developmental scores on his LAP, as well as the goals of his IEP show that he "is a child whose progress has been and will continue to be impacted by his etiology of Down syndrome and some degree of hearing loss as a secondary component. His primary disability is mental retardation." *Id.*

Dr. Howell also commented on the videotape recorded by Dr. Rabush in June 1996. She noted that the special education teacher and her two aides used Total Communication to communicate with the students. *Id.* She acknowledged that the skills of the teacher and aides in sign language was likely to be less fluent than of trained deaf educators, but that they were able to sign directions to the children, introduce concepts and tell stories in sign language. *Id.* Further, they were able to understand the students' expressive signs, despite the fact that all of the children had significant disabilities, and their use of signs was often unclear. *Id.* Dr. Howell observed that the teachers and aides encouraged students to use sign when they forgot to do so, and that an FM auditory system was in use during the class. *Id.* She pointed out that the ACSB had specifically hired a teacher who was trained to work with children who had significant cognitive, speech and language delays, and that this teacher also had functional sign language skills. *Id.* at 11–12. She noted that the sign language for Mark's class had to be delivered at a cognitive level appropriate to the cognitive level of the students in the class. *Id.* at 12. As she observed, "[m]ore signs are not al-

ways better if the child is unable to attend for the length of a full sentence or several sentences." *Id.* The videotape reinforced Dr. Howell's opinion that the Cash Valley program was a proper placement for Mark, and was providing him with the educational services which he needed. She also concluded that Mark would be able to resume placement at Cash Valley in the future. *Id.*

Finally, Dr. Howell responded to the opinions of Dr. Jensema, attached as Kings' Supplemental Exhibit H. Although Dr. Howell agreed with Dr. Jensema's assessment of Mark's cognitive developmental level, she took issue with Dr. Jensema's opinion that if Mark were exposed to language through visual channels (i.e. American Sign Language), at the same developmental ages that children who do not have hearing impairment were, his language functional level would equal his intelligence level. Dr. Howell stated that this conclusion overlooks Mark's additional disabilities, which include: tactile defensiveness, lack of sensory integration, chronic otitis media, hypotonicity, vision problems, gross motor delays, limited attention span and other health problems. *Id.* Moreover she notes that Mark's behavioral problems had persisted even at WVSDB, and that all of his difficulties impede his progress. *Id.* In support of this conclusion, Dr. Howell pointed out that when Mark was given the LAP in May of 1997, his teacher had to give him the test over a period of days, in 10–15 minute segments, since he could not tolerate the usual testing conditions. *Id.* at 13. Dr. Howell noted that Mark's attention span and behavioral characteristics still are an issue. *Id.* Dr. Howell's final observation regarding the significance of the LAP results is that is difficult, if not impossible, to identify a test which adequately would measure Mark's expressive and receptive language levels, given his multiple disabilities. *Id.* Dr. Howell concluded:

> In summary, there is little doubt that Mark King's case is a complicated one since he has a complicated medical and educational history. However, it is my belief that he can be appropriately served by Allegany County Schools based upon my review of all of the documents, affida-

vits, and videotape provided to me.... The IEP proposed by Allegany County Schools can be implemented to meet Mark's educational needs.

*Id.*

Defendant's final exhibit, Supplemental Exhibit K, is an affidavit from the Superintendent of the WVSDB authenticating two exhibits: ACSB Exhibit K.1 (the dissenting opinion to the May 1996 recommendation of Mark's IEP committee that he be placed in the WVSDB, submitted by Mr. Terry Gruber, one of Mark's instructors at WVSDB); and ACSB Exhibit K.2 (a memorandum dated May 7, 1996, from Ms. Sheree Witt, Mr. Rob Cockey, and Ms. Cathy Kesner of the ACSB memorializing their dissent from the recommendation of Mark's IEP Committee that he be placed in the WVSDB). In the first exhibit, Mr. Gruber raised the following four points in support of his dissent regarding Mark's placement: (1) it was his belief that Cash Valley provided Mark with the least restrictive learning environment; (2) he viewed Mark's primary disabling condition as mental impairment, and therefore believed that Mark's teachers needed to be trained to educate children with mental retardation, as opposed to staff trained to educate deaf children; (3) he felt that by educating Mark with students who were primarily hearing impaired, Mark was being restricted to the "deaf sub-community," instead of being integrated into the community at large, where he believed Mark had "tremendous potential" to contribute; and (4) he felt that, in most instances, the services offered by the Cash Valley IEP equaled or exceeded those offered by the WVSDB IEP, and that in one important aspect, the use of teaching staff trained to educate mentally impaired students, the Cash Valley IEP was clearly superior. (ACSB Exhibit K.1).

In their final exhibit, ACSB K.2, three ACSB officials who participated in the development of Mark's IEP stated the basis for their objections to the WVSDB IEP. Their reasons were: (1) the goals of Mark's IEP could be addressed in the lesser restrictive environment of Cash Valley; (2) the goals of Mark's IEP should be implemented in a "more appropriate peer group-ing" of students with similar disabilities and communication styles; (3) the WVSDB did not provide for services, such as audiological assistance, which Mark needed, and also provided insufficient speech/language services; and (4) Mark's IEP was developed based upon his disability being designated as "communication disordered and deaf/hard of hearing" while a more appropriate designation would have been "multi-disabled," which would have given proper recognition to his mental retardation. (ACSB Exhibit K.2).

## B. The Parties Cross–Motions for Summary Judgment

■ The Kings have filed a motion for summary judgment (Paper No. 23), which the ACSB has opposed (Paper No. 25). The ACSB has filed a motion for summary judgment on the two remaining counts not previously disposed of by this Court's Order of June 19, 1997 (Paper No. 22), to which the Kings have filed an opposition (Paper No. 24). These papers address the additional evidence, as well as the findings of the administrative proceedings below. Summary judgment is the most pragmatic procedural mechanism for resolving IDEA cases where, in addition to the administrative record, the district court has received additional evidence. *Wall v. Mattituck–Cutchogue Sch. Dist.,* 945 F.Supp. 501, 507–08 (E.D.N.Y. 1996).

Neither the Kings nor the ACSB spend much time in their summary judgment papers analyzing either the administrative record, or the additional evidence submitted. Instead, they devote a great deal of time to arguing about the standard of review of the administrative decisions and the deference entitled these findings. The Kings assert that this Court should independently review all of the evidence, then reach a decision based on a preponderance of the evidence, giving no weight to the findings of the administrative decision-makers. They urge that the Court reverse both the local level hearing officer—because he assertedly failed to consider the evidence which the Kings offered at the local level administrative hearing—as well as the state review panel, which, the

Kings contend, erroneously failed to consider evidence regarding the WVSDB, for purposes of comparing its program to the one proposed by the ACSB. Predictably, the ACSB contends that the Court must give great deference to the administrative findings, and asserts that, under the law of this circuit these findings are *prima facie* correct.

With respect to the local level proceedings, the Kings argue that they were denied due process because the hearing officer deliberately refused to consider the evidence elicited from Dr. Resnick, an audiologist, and Dr. Isquith, a pediatric neuropsychologist, and that he further failed to take into consideration the ACSB's "years of neglect" of Mark's hearing loss. (Paper No. 24 [King's reply brief to ACSB's motion] at 3). Instead, the Kings argue, the hearing officer adopted the "clearly biased" testimony of the employees of the ACSB as well as their expert, Dr. Howell. *Id.* It is noteworthy that, while the Kings assert in conclusory fashion that the administrative proceedings failed to comply with the procedural requirements of the IDEA, they identify no provisions of that law, or its implementing regulations, or the applicable state statute and implementing regulations,[5] which they contend were violated.[6] Reduced to its essentials, the Kings claim (1) that the local level hearing officer did not consider the evidence they produced during the four day hearing, but accepted at face value the evidence produced by the ACSB; and (2) that the state review panel wrongly refused to hear evidence comparing the WVSDB program with the ACSB program. Accordingly, the Kings argue, the administrative proceedings are not entitled to deference and should not be regarded as *prima facie* correct. The Kings further contend that an independent review of the evidence of record reveals that the program proposed by the ACSB did not, and would not in the future, provide Mark with a free appropriate public education, as required by the IDEA. They therefore conclude that the

ACSB should be required to reimburse them for the expense of sending Mark to the WVSDB. As will be seen, the Kings are incorrect in their assertions. The starting point is to review the law which governs the resolution of this case.

**C. Applicable Law**

*1. Standard of Review*

The parties spend a substantial portion of their summary judgment memoranda discussing the appropriate standard of review for this Court to use in resolving an IDEA case, drawing markedly different conclusions regarding the amount of weight which must be given to the findings and conclusions of the local and state administrative determinations in Mark's case. Because of the importance of this issue, it is essential to start with a clear understanding of the standard of review which must be applied.

In *Board of Educ. of the Hendrick Hudson Cent. Sch. Dist., Westchester County v. Rowley,* 458 U.S. 176, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982), the Supreme Court first stated the standard of review which governs district court review of IDEA cases. The Court admonished that district courts not substitute their own notions of sound educational policy for those of local and state school authorities, and required district courts to give "due weight" to the local and state administrative proceedings. *Id.* at 206. The Court identified a two-part inquiry which should be used in IDEA cases. First, the reviewing court must determine whether there had been compliance with the procedural requirements of the IDEA. Second, the court must then ascertain whether the IEP in question was reasonably calculated to enable the child to receive educational benefits. *Id.* at 206–07. In making these determinations, the Court warned that reviewing courts had to be careful to avoid imposing their own views of preferable educational

---

5. The IDEA is codified at 20 U.S.C. § 1400 *et seq.*, and implemented by 34 C.F.R. § 300.1 *et seq.* At the state level, the IDEA is implemented by Md.Code Ann., Educ. § 8–401 (1996) *et seq.* and COMAR 13A.05.01.01 *et seq.*

6. During oral argument on February 24, 1998, counsel for the Kings was asked to identify any specific provision of the IDEA and its implementing regulations, or the state statute and its implementing regulations, which the Kings contend was violated. He was unable to identify any.

methods on local and state educators, who are primarily charged with the responsibility of educating children, because the courts lack the specialized knowledge and experience needed to resolve difficult questions of educational policy. *Id.* at 207–08.

The Fourth circuit has embraced the *Rowley* standard, and further expanded on the proper role for district court review in IDEA cases. In *Doyle v. Arlington County Sch. Bd.*, 953 F.2d 100 (4th Cir.1991), the court held that, generally, a district court reviewing state administrative decisions in IDEA cases is required to make an independent decision based upon a preponderance of the evidence, giving "due weight" to the state administrative proceedings. *Id.* at 103. In so doing, the court makes a "bounded" independent decision, based upon the administrative record and any additional evidence. *Id.* The court held that if, at the administrative level, the findings of fact were made by a hearing officer in a regular manner and with evidentiary support, they are entitled to presumptive validity, and are to be considered *prima facie* correct. *Id.* at 105. The court added, however, that if the district court decides not to follow administrative fact findings which had been regularly made, it must explain why it does not. *Id.* Finally, the district court should examine how the state administrative authorities arrived at their decision, and the methods employed to do so, and then, after giving those findings "due weight," is free to decide the case on a preponderance of evidence standard. *Id.*

In *Hartmann v. Loudoun County Bd. of Educ.*, 118 F.3d 996 (4th Cir.1997), the Fourth Circuit again discussed the appropriate standard of review in IDEA cases, in an opinion which was highly critical of the district court's determination of the case. The court stated that § 1415(e)(2) of the IDEA, which permits judicial review of state and local IDEA determinations, is by no means an invitation for courts to substitute their own notions of sound educational policies for those of school districts. *Id.* at 1000. Absent some statutory infraction, the task of education belongs to educators, not judges, and federal courts must give due weight to state administrative proceedings. *Id.* at

1000–01. The court reiterated that administrative findings in IDEA cases are *prima facie* correct, and observed that state administrative proceedings must command considerable deference in federal courts. *Id.* at 1001–02.

Finally, this Court has expressed the view that when reviewing an IDEA case, if the district court determines that both the local level hearing officer and the state review authority reached the same conclusion with respect to the issues, even greater deference is due to the administrative findings. *Sanger v. Montgomery County Bd. of Educ.*, 916 F.Supp. 518, 521 (D.Md.1996)(citing *Combs v. School Bd. of Rockingham County*, 15 F.3d 357, 361 (4th Cir.1994)). Moreover, in reviewing the administrative record to determine whether there has been compliance with the IDEA, the district court must consider whether any failure to do so has caused a loss of educational opportunity, or is merely technical in nature. *Id.* at 526–27 (citing *Burke County Bd. of Educ. v. Denton*, 895 F.2d 973 (4th Cir.1990)).

■ Thus, as one court has noted, in reviewing the administrative record in an IDEA case, the district court is placed in the paradoxical position of having to be an independent finder of fact, while concomitantly giving deference to the administrative findings. *Wall v. Mattituck–Cutchogue Sch. Dist.*, 945 F.Supp. 501, 507 (E.D.N.Y.1996). It is clear, therefore, that the starting point for the district court is to review the administrative record to determine whether the local and state decision-makers complied with the requirements of the IDEA, and to evaluate whether there is evidentiary support for the conclusions which were reached. Following this review, the district court must then determine whether it will follow the administrative fact findings, and if not, must clearly state why.

2. *The Standard for Determining Whether a "Free Appropriate Public Education" has Been Afforded*

■ The lynchpin of the IDEA is its requirement that disabled children be provided with a "free appropriate public education" ("FAPE"). *Rowley*, 458 U.S. at 186–204.

Therefore, in cases such as this one, where the school authorities and the parents of the disabled child offer competing educational programs, it is essential that the district court have a proper understanding of what the IDEA requires. The Supreme Court addressed this issue at some length in *Rowley*. First, the Court noted, there is no substantive standard in the IDEA regarding the level of education to be provided, nor is there any requirement that state and local educators must maximize the potential of disabled children. *Rowley*, 458 U.S. at 189–90. Similarly, there is no requirement to guarantee any particular outcome for the child. *Id.* at 192. The IDEA only requires that states insure that their disabled children receive some form of specialized education, and an "appropriate education" is afforded when personalized services are provided for the child. *Id.* at 195–97. The Court observed that it was the intent of Congress in enacting the IDEA that disabled children would be provided a basic floor of opportunity, but beyond this Congress did not impose any particular substantive standard the states had to meet. *Id.* at 200. All that is required of the states by the IDEA is that the education provided be sufficient to confer some educational benefit to the child. *Id.* at 200–01. There are two key components to this requirement: (1) the child must be given access to specialized instruction, and (2) the child must also receive related services individually designed to provide educational benefit (known as "support services"). *Id.* at 201.

The Fourth Circuit also has addressed what is required to provide a disabled child with a FAPE. In *Hessler v. State Bd. of Educ.*, 700 F.2d 134 (4th Cir.1983), the court, interpreting the predecessor statute to the IDEA—which also imposed the FAPE standard—addressed a situation similar to the issue in this case. The court stated that where the parents of a disabled child assert that the educational program provided by a non-public school provides a better education than the public school program proposed by state education officials, the fact that the program proposed by the parents is allegedly more appropriate does not mean that the program proposed by the state is inappropri-

ate. *Id.* at 139. The court explained that there is no requirement that the state provide the child with the best education—public or private—that money can buy, nor is the state required to maximize the potential of the student. *Id.* All that is required is that the disabled child benefit educationally from the program. *Id.* Similarly, in *Burke County Bd. of Educ. v. Denton*, 895 F.2d 973 (4th Cir.1990), the court held that in establishing the FAPE requirement, Congress did not intend that every specialized program necessary to maximize a disabled child's potential be provided. *Id.* at 980. It is sufficient that the IEP proposed for the child be reasonably calculated to enable the child to receive educational benefits. *Id.*

In *Doyle*, the Fourth Circuit ruled that a FAPE is provided when the state affords the disabled child with particularized instruction with sufficient support services to permit the child to benefit educationally from the instruction. *Doyle*, 953 F.2d at 106. Finally, in *Hartmann*, the Fourth Circuit held that the IDEA does not require the furnishing of every special service to maximize a disabled child's potential, nor does it require every specialized education service provider to have every conceivable credential relevant to every child's disability. *Hartmann* 118 F.3d at 1004. Citing *Rowley*, the court stated that the IDEA does not guarantee the ideal educational opportunity for every disabled child. *Id.* at 1004.

Other circuits are in accord with the Fourth Circuit. In *Fort Zumwalt Sch. Dist. v. Clynes*, 119 F.3d 607 (8th Cir.1997), for instance, the court held that the IDEA is complied with when the school district provides the child with a FAPE as defined by the Act, even though the child may well have benefited more from the education provided by a private school where the parents had placed the child. *Id.* at 612. The Fifth Circuit recently observed that there are four factors which serve as indicators whether an IEP is reasonably calculated to provide educational benefit as required by the IDEA: (1) the program is individualized on the basis of the student's assessment and performance; (2) the program is administered in the least restrictive environment; (3) services are pro-

vided in a coordinated and collaborative method by the key "stakeholders" in the child's education; and (4) positive academic and non-academic benefits are demonstrated by the program. *Cypress–Fairbanks Indep. Sch. Dist. v. Michael F.*, 118 F.3d 245, 253 (5th Cir.1997).

█ Finally, in evaluating whether the IEP proposed by the local school board for a disabled child provides a FAPE, deference may be given to trained educators over psychologists or other "experts," and the child's teachers are especially helpful in the development of an appropriate IEP. *Heather S. v. State of Wisconsin*, 125 F.3d 1045, 1047 (7th Cir.1997). *Accord Schreiber v. Ridgewood Bd. of Ed.*, 952 F.Supp. 205, 211–12 (D.N.J.1997)(testimony of child's teachers that child's behavior and education had improved since enrollment at school relied on by court to find that educational benefit had been conferred on child).

### 3. *Burden of Proof*

█ There is a split in the circuits on the issue of who has the burden of proof in IDEA cases—the school board or the parents of the disabled child. *See Wall*, 945 F.Supp. at 509. It is established in this circuit, however, that the burden of proof is on the party challenging the results of the state administrative proceedings. *Barnett v. Fairfax County Sch. Bd.*, 927 F.2d 146, 152 (4th Cir.1991). *Accord Sanger v. Montgomery County Bd. of Educ.*, 916 F.Supp. 518, 521 (D.Md.1996). Accordingly, in this case, the Kings bear the burden of proving that the IEP and Cash Valley placement proposed by the ACPS for Mark does not afford him a FAPE.

With these legal standards in mind, it is now appropriate to examine the administrative proceedings below, to determine whether they were conducted in accordance with the IDEA, and the amount of deference they are entitled to by this Court.

### D. The Administrative Proceedings

#### 1. *The Local Level Hearing*

The local level hearing conducted in Mark's case was summarized in substantial detail at pages 8–42 of the May 30th, 1997 Report and Recommendation which was adopted by the District Court in its Order of June 19, 1997. (Paper No. 17) (herein the "First Report and Recommendation"). As noted in the First Report and Recommendation, the hearing lasted four days, and the hearing officer heard the testimony of five witnesses called by the Kings, and seven called by the ACSB. (Paper No. 17 at 8–9). Both the Kings and the ACSB were represented by experienced and skillful counsel. Additionally, the hearing officer received into evidence 110 joint exhibits.[7]

█ As noted at page five of the First Report and Recommendation, the local level hearing officer, Robert M. Forder, Ph.D., was a former classroom teacher, school psychologist, and served as a faculty member of Hood College, where he taught psychology and special education.[8] Accordingly, as required by Md.Code Ann., Educ. § 8–413(c)(2)(ii) (1996) and COMAR 13A.05.01.14H(5) and .15H(3)(a), the hearing officer had special expertise in issues involving the education of disabled children. After the hearing concluded, on February 12, 1996, Dr. Forder issued a 15 page written "decision report" (hereinafter "Local Level Decision").[9] It reflects that the hearing officer

---

7. The ACSB attached the transcript of the hearing and the exhibits to its motion for partial summary judgment (Paper No. 7). As noted at page 9, note 3 in the First Report and Recommendation, the relevant exhibits are: Exhibit B (transcript of the October 16, 1995 hearing); Exhibit C (transcript of the October 23, 1995 hearing); Exhibit D (transcript of the December 8, 1995 hearing); Exhibit E (transcript of the February 8, 1996 hearing); and Exhibit A (the 110 joint exhibits submitted during the local level hearing). As was done in the First Report and Recommendation, citations to the testimony and

exhibits will be referred to by the exhibit number and page reference or document number of the above referenced exhibits.

8. Exhibit B at 4–5

9. The local Level Decision was attached as Exhibit A to the King's complaint (Paper No. 1). To avoid confusion with the exhibits attached to the ACSB's motion for partial summary judgment, references to the Local Level Decision will be cited as "Local Level Decision at __".

commenced the hearing by determining that the Kings had been "fully informed of and afforded their due process rights as provided by law." Local Level Decision at 4. The hearing officer then summarized in detail the relevant background facts relating to Mark's disability and chronology of his interaction with the ACSB leading up to the development of the 1995–96 IEP, which was the subject of the hearing. *Id.* at 5–9. Comparing this background discussion with the exhibits which were admitted into evidence during the local level hearing, I was able to find documentary support for the events summarized in this portion of the Local Level Decision.

Dr. Forder next framed the two issues to be decided during the hearing: (1) whether the IEP proposed by the ACSB for Mark was appropriate to meet his special educational and related services needs, and (2) whether placement of Mark at the Cash Valley Elementary School was appropriate to meet those needs. *Id.* at 8. After stating the issues, the hearing officer then summarized the primary contentions of both the Kings and the ACSB with respect to the two issues. *Id.* at 8–10. I was able to find support for Dr. Forder's summary of these contentions in the transcripts of the local level proceedings.

Dr. Forder next addressed the WVSDB issues, noting that on the fourth and final day of the hearing the Kings advised that a West Virginia state court judge had issued an order permitting Mark to attend the WVSDB. *Id.* at 10. Dr. Forder decided to address this issue as follows: he would first determine the whether the IEP proposed for Mark and his placement at Cash Valley was appropriate for his special educational and related services needs. If that inquiry was favorable to the ACSB, then any information about the

WVSDB would be moot. If determined in favor of the Kings, then he would permit the Kings to offer evidence regarding the WVSDB in order to decide if the program at that school would meet Mark's special education and related services needs. *Id.* at 10–11.[10]

The hearing officer next identified 15 findings of fact. *Id.* at 11–13. In reviewing them, I note that for each Dr. Forder adverted to specific exhibits which had been introduced, as well as to the testimony of the witnesses, by name. Although the references to the testimony of the witnesses do not contain citations to the transcript,[11] I was able to find specific testimony in those transcripts to support the facts which were found by Dr. Forder. Contrary to the assertion of the Kings, Dr. Forder clearly did consider the testimony of the witnesses they called, inasmuch as he cites to the testimony of Dr. Isquith, Dr. Resnick, Ms. McMenamin and Mr. King throughout the findings of fact.

▮▮▮ Moreover, although the Kings fault Dr. Forder for not making credibility determinations, particularly ones adverse to the ACSB witnesses, it is clear that he did draw conclusions about the credibility of the witnesses. For example, in the tenth finding of fact, Dr. Forder noted that the three expert witnesses called by the Kings[12] "relied on Mark's parents' description of [ACSB]'s Special Education Program and never observed Mark at Cash Valley or consulted with [ACSB] staff about what is in [the] 1995–96 IEP." (Local Level Decision at 12, # 10 (citations to documents and witnesses omitted)). While he did not expressly state that this fact finding undermined the credibility of the Kings' experts, it clearly explains why he credited the experts called by the ACSB over those called by the Kings. In this regard, I note that it is implicit in the Fourth Circuit's

---

**10.** Because he hearing officer ultimately decided the two issues adversely to the Kings, he did not return to the WVSDB issue or receive any evidence from the Kings regarding the services which this school would offer Mark. The Kings do not assert that this was an error on the part of the local level hearing officer, nor was it. As·of the close of the local level hearing, Mark had not actually begun instruction at WVSDB. This had changed, however, by the time of the state level review hearing. The Kings do contend that, at

the state level, they improperly were denied the right to present evidence about the WVSDB program, a contention addressed in the next section of this Report and Recommendation.

**11.** Undoubtedly because the transcript had not yet been prepared.

**12.** Dr. Resnick, Ms. McMenamin and Dr. Isquith.

holding in *Doyle,* 953 F.2d at 104–05, that credibility determinations of local level hearing officers—particularly when made during regularly conducted administrative hearings—who themselves have had the benefit of personal observation of the witnesses, are not to be lightly disregarded, either by state level reviewing administrative law judges, or reviewing district courts.

▮ Moreover, from my independent review of the transcripts of the local level hearing, I find more than ample evidence to justify the hearing examiner's credibility determinations in this regard. For example, Ms. McMenamin, the Kings' educational specialist who testified so forcefully that the ACSB had failed in its efforts on Mark's behalf, admitted on cross examination that she had never observed Mark's class at Cash Valley, admitted that she viewed herself as an "advocate" of Mark's family, not an independent observer, and acknowledged that she obtained many of the "facts" to support her conclusions from the Kings themselves, yet never bothered to consult with representatives of the ACSB to verify their accuracy. (Exhibit B at 187–226; Exhibit D at 9–54). Additionally, she acknowledged that she had minimal direct teaching experience with children who have Downs syndrome. *Id.* Although she was highly critical of the ACSB's education of Mark, she had not reviewed the goals in his IEP, and her conclusion that Mark was not getting sufficient sign instruction was based on what she was told by the Kings, without any effort to discuss this aspect of Mark's instruction with his teachers. *Id.* Finally, the transcript reflects that Ms. McMenamin was aware that Mark's parents wanted him enrolled in the WVSDB, and she acknowledged that her view was that the *ideal* educational environment for Mark would involve total use of sign language, such as proposed by WVSDB.[13] *Id.*

Similarly, with respect to Dr. Isquith, a neuropsychologist called by the Kings who testified that Mark showed no measurable development of his language functions over time, and that Mark had not improved while at Cash Valley, there is support for the hearing officer's evident conclusion that his credibility had been undermined. For example, Dr. Isquith testified that he did not know that he was to be an independent evaluator of Mark; he did not talk to any of the staff at Cash Valley before writing his report; he relied on the Kings' description of the Cash Valley program where Mark was enrolled; he was not clear about what services Mark was getting at Cash Valley; and his report contains no discussion of Downs syndrome as a contributing factor to Mark's difficulties in language development. (Exhibit C at 118–67).

I equally question Dr. Resnick's objectivity. Described by counsel for the Kings as the only "qualified" audiologist who testified during the hearing, Dr. Resnick testified that the Cash Valley program was "trivializing" Mark's hearing problems. She admitted during cross examination, however, that she believed that Mark deserved the "best possible" educational environment;[14] acknowledged that she knew nothing about the Cash Valley program except that she did not think that it had worked for Mark; admitted that she viewed herself as representing Mark; and conceded that she did not know what audiology services Mark received at Cash Valley. Additionally, I note that Dr. Resnick had never visited Cash Valley, was unfamiliar with any of Mark's teachers there, and could not describe the Total Communication Program at Cash Valley, because she did not even know that there was one. (Exhibit C at 178–268). Thus, from my independent review of the evidence produced during the local level hearing, I find that there is ample support for the hearing officer's obvious conclusion that the expert witnesses called by the Kings were less credible than those called by the ACSB.

▮ Moreover, the Kings' assertion that Dr. Resnick was the only "qualified" audiolo-

---

13. As noted in section C.2 above, the IDEA does not require that disabled students receive an "ideal" education, nor one which maximizes their potential. It is enough if the program is tailored to meet the special needs of the child, both educationally and with respect to support services, and confers actual educational benefit. This will be discussed in more detail below.

14. *See* note 13.

gist who testified at the hearing is contradicted by the record. The transcript reflects that the ACSB called Janet Mickey, the ACSB audiologist, as a witness during the local level hearing. (Exhibit D at 206–70).[15] Ms. Mickey disagreed with Dr. Resnick regarding the nature of Mark's hearing loss, identified additional tests she thought were required in order to make a more definitive diagnosis of his hearing problems, and described the audiology services Mark was receiving at Cash Valley. Based upon her personal observation of Mark in his classroom environment, she testified that he did respond to spoken communication, and therefore the total communication program at Cash Valley, which utilized both spoken word and sign communication, was appropriate. (Exhibit D at 206–65). Moreover, Dr. Forder clearly accepted the testimony of Ms. Mickey over Dr. Resnick, as his findings of fact refer to Ms. Mickey as the source, in part, of many of his fact findings. Thus, from my independent review of the administrative record there is clear evidentiary support for Dr. Forder's findings with respect to the audiological testimony.

Further, the Kings' argument that Dr. Forder "ignored" their experts in favor of "less credible" experts produced by the ACSB simply is not supported by an objective review of the evidence. The testimony of the witnesses called by the ACSB was summarized in some detail at pages 23–42 of the First Report and Recommendation. The witnesses included the teachers and professional staff who had daily contact with Mark, and who had participated in the development of the 1995–96 IEP, bringing to that process their direct knowledge of his needs. The Kings argue that these witnesses were less credible than theirs, because of their connection with the ACSB. Far from detracting from their credibility, however, this connection clearly could have been viewed by the hearing officer as enhancing their credibility, inasmuch as they had direct, ongoing contact with Mark, and greater personal knowledge of his condition and needs than the consulting experts who testified on behalf of the Kings. Other courts called upon to review administrative records in IDEA cases have noted the usefulness of the testimony of the teachers and support staff who have actual experience with the child, going so far as to credit their testimony over that of "experts" retained for the purposes of testimony at the hearing. *See, e.g., Schreiber v. Ridgewood Bd. of Educ.*, 952 F.Supp. 205, 211–12 (D.N.J. 1997) (reliance on testimony of child's teachers that child had received educational benefit, and had shown improvement in behavior); *Heather S. v. State of Wisconsin*, 125 F.3d 1045, 1057 (7th Cir.1997) (in determining whether FAPE was provided to child, "deference" was given to trained educators over psychologists or experts. Child's teachers are especially helpful in developing an IEP).

Having carefully and independently considered the testimony of all of the witnesses called during the local level hearing, I find that there is more than sufficient evidence to support the hearing officer's obvious conclusion that the testimony of the witnesses called by the ACSB deserved more weight than the witnesses called by the Kings. Having seen all of the witnesses testify, and given his special expertise in the field of educating children with disabilities, his conclusions regarding credibility of witnesses, particularly when supported by evidence in the record, is entitled to great deference by this Court.

After the findings of fact, the hearing officer stated three conclusions of law: (1) that Mark was a multiple disabled student with both significant mental retardation and hearing impairment, as defined by the applicable provisions of COMAR which implement the IDEA; (2) that the 1995–96 IEP proposed by the ACSB for Mark was appropriate to provide him with a FAPE, and was calculated to benefit him in his special educational and related services needs as required by the IDEA; and (3) that the Cash Valley Elementary School placement of Mark would fulfill the goals of the 1995–96 IEP. (Local Level Report at 13).

After the statement of these conclusions, the hearing officer provided a discussion of

---

**15.** Ms. Mickey's testimony was summarized in detail at pages 30–33 of the First Report and Recommendation issued in connection with this case.

the rationale for his decision. *Id.* at 13–14. The following points were noted. Dr. Forder clearly recognized the Kings' contention that the ACSB had failed to properly consider Mark's hearing loss over the years, and, accordingly, to make-up for inadequate programming in the past, he had to be placed in the WVSDB. *Id.* at 13. Dr. Forder observed that the "core issue" which needed to be resolved in responding to the Kings' contention was "the specificity of Mark's degree of hearing loss." *Id.* at 13–14. He added that the hearing had produced conflicting historic documentation regarding the assessment and analysis of Mark's hearing problems, which led him to "question any specific pronouncement as to the degree of Mark's audiologic analysis." *Id.* at 14. Furthermore, he observed that Mark's mental retardation and behavioral problems made it difficult to "absolutely" substantiate the degree of his hearing loss. *Id.* The hearing officer accordingly concluded that it was essential that there be a continued effort to monitor Mark's hearing capabilities, both clinically and behaviorally. *Id.* He found that the proposed IEP was designed to accomplish this, as well as address Mark's mental retardation. *Id.*

Dr. Forder also addressed the Kings' argument that Mark had not progressed in his programs at Cash Valley, and that this proved that the proposed IEP was inappropriate for him. In response to this argument, he concluded:

> [Counsel for the Kings], unfortunately, used unstable test scores which only revealed Mark's fluctuating functioning at a limited time frame, not over time. Mark's behavioral manifestations have made it impossible to know which Mark was demonstrating his functional abilities: the so-called and diagnosed severely hearing impaired child or the child who demonstrated hearing unaided, both of which impacted scores on tests. I believe, given Mark's present and past condition, the only reasonable manner to assess him and, therefore, appropriately program for him is

through the gathering of long term observational data and having the flexibility to change his program as dictated by the observational data. I believe [the ACSB] has been attempting just that.

*Id.*

From my independent review of the evidence adduced during the local level hearings, I cannot conclude, as do the Kings, that there was no evidentiary support for these conclusions. (First Report and Recommendation at 8–42). Although, in reaching his findings and conclusions, Dr. Forder resolved factual disputes regarding the nature of Mark's hearing impairment adversely to the position advocated by the Kings and their expert witnesses, there was ample evidence, summarized above, to support the hearing officer's decision to accept the testimony of the witnesses called by the ACSB over those called by the Kings. In reaching this conclusion, I am mindful of the fact that the Supreme Court and the Fourth Circuit have repeatedly stressed the need for reviewing judges not to substitute their judgment for that of trained educators, and I particularly note the special expertise of the local level hearing officer in matters relating to the education of children with disabilities. Having carefully and independently reviewed the evidence produced at the local level hearing, and the hearing officer's report, I find that the factual findings reached by the hearing officer resulted from a hearing that complied with the procedural requirements of the IDEA, its implementing regulations, as well as the Maryland statute and implementing regulations; that they are entitled to deference by this court; and are *prima facie* correct. *Rowley,* 458 U.S. at 176; *Doyle,* 953 F.2d at 100.

## 2. The State Level Review Proceedings

The Kings filed a timely appeal from the findings of the local level hearing examiner, and on June 26, 1996, a state level review hearing was conducted by a three member review board.[16] The review panel issued its

---

**16.** The proceedings before the state review board were discussed at pages 47 through 50 of the First Report and Recommendation. The written report of the review panel was attached as Exhibit G to the ACSB's original motion for partial summary judgment. To avoid confusion, it is cited herein as "State Review Decision at __".

20 page written decision on August 19, 1996. The decision began with a statement of the background facts pertinent to Mark's case, which contains a good summary of the chronology of the changes in services provided to Mark by the ACSB from the time shortly after his birth to the development of the 1995–96 IEP which was the subject of the administrative hearings. (State Review Decision at 2–5).

Next, the decision identified the evidence which the review panel received, which consisted of the complete transcript of the local level hearings (both typed transcripts, and audio cassette recordings), as well as all of the exhibits received by the local level hearing officer. *Id.* at 6.[17] The decision notes, and a review of the transcript of the state proceedings confirms, that the review panel based its analysis on the evidence presented to the local level hearing officer and the argument of counsel.

■ Next, the State Review Decision contains a statement of 12 fact findings, falling into three categories: (1) fact findings of the local level hearing officer which were adopted by reference by the review panel; (2) findings of the local level hearing officer which were "restated" by the review panel; and (3) additional findings of fact. *Id.* at 6–9. The first 11 findings of fact contain supporting references to the testimony (without specific page designation) of the witnesses relied upon by the review board. Significantly, the review panel found that the 1995–96 proposed IEP had been developed on July 5, 1995 during an Admission, Review and Dismissal ("ARD") Committee meeting, and included a Total Communication environment (combining manual sign language and oral communication), daily one-on-one speech therapy, daily audiology monitoring, daily fine motor skills occupational therapy, and instruction on the use of hearing aids. *Id.* at fact finding 6, p. 7. Further, the review panel found that the IEP proposed for Mark would place him in a classroom with students with a variety of disabilities, all of whom were cog-

nitively impaired, and required a total communication environment. *Id.* The class proposed for Mark would consist of six students, staffed by four teachers. My independent review confirms that the Review Panel's factual findings here were supported not only by the testimony during the local level hearing, but also by the documentary evidence received (particularly Exhibit Nos. 102 and 103).

The review panel further found, as a restated finding of fact, that Mark's proposed IEP addressed his related services needs, providing hearing, speech and language therapy, as well as goals to reduce his tactile defensiveness, and an FM speaker system to help address Mark's reluctance to keep his hearing aids in. *Id.* at fact finding 7, p. 8. Again, from my independent review of the record, there is both documentary and testimonial support for these fact findings.

As additional fact findings, the review panel found that the staff at Cash Valley Elementary School assigned to implement the IEP possessed state certification in his or her field of expertise, which included audiology, speech pathology, and special education classroom instruction. *Id.* at fact finding 10, pp. 8–9. Thus, the review panel found that the Cash Valley staff possessed the necessary training, skills and certification to implement the proposed IEP. *Id.* My independent review of the record confirms the accuracy of this additional finding of fact.

Finally, the review panel itself noted that Dr. Resnick, Dr. Isquith and Ms. McMenamin, the Kings' three experts, believed that they were employed by, if not advocates for, the Kings, and that their opinions had been formed without having been influenced by any first-hand knowledge of the Cash Valley program or staff. *Id.* at fact finding 11, p. 9. As I have noted in some detail in the previous section, this finding of fact is supported by evidence produced during the local level hearing.

17. *See* pages 47 through 50 of the First Report and Recommendation for a discussion of the circumstances which led to the decision of the parties not to introduce any additional evidence at the state review level. These circumstances will be discussed in more detail in this section, as they are the basis for the Kings' contention that they were denied due process by the State Review Board.

Thus, from my independent review of the evidence relied upon by the State Review Panel, I conclude that the findings of fact of the review panel are supported by the record. Indeed, the Kings themselves do not take issue with any of the fact findings, but confine their attack on the review panel to a contention that the panel erred by refusing to allow the Kings to introduce evidence of the WVSDB school, where Mark had been enrolled prior to the commencement of the state review proceedings. (Paper No. 23 at 14).

After stating the findings of fact, the Review Panel discussed its decision. Subsequent to addressing the "additional evidence" issue presented by the Kings' desire to introduce evidence regarding the WVSDB, discussed in more detail below, the Review Panel explained why it agreed with the local level hearing officer that the 1995–96 IEP proposed for Mark by the WVSDB did provide him with a FAPE as required by the IDEA, and that the Cash Valley Elementary School was an appropriate place to implement that IEP. *Id.* at 9–18. For reasons which will be explained in more detail below, I agree with the Review Board's conclusions. Before explaining why, however, it is first necessary to address the Kings' contention that the review panel denied them due process by refusing to allow them to introduce evidence of the WVSDB program where Mark had been enrolled.

■ As noted in the discussion of the state review board proceedings in the First Report and Recommendation, counsel for the Kings agreed with the review panel that it should "bifurcate" the proceedings,[18] as did the local level hearing officer. (First Report and Recommendation at 47–48). What followed this agreement, however, was an extended exchange between counsel for the Kings and the presiding state administrative law judge regarding what "new" evidence could be introduced. *Id.* at 48–49. This exchange is fairly characterized as an effort by the review panel to confine any new evidence to the issues regarding the appropri-

ateness of the proposed IEP and Cash Valley placement, and not to allow evidence about the WVSDB program for "comparative purposes," given the agreement of all involved that such evidence would only be introduced if the first two issues were resolved in favor of the Kings. In response, counsel for the Kings skillfully endeavored to characterize the Review Board's efforts as a ruling which prevented him from introducing "new" evidence, which he proffered to the panel. *Id.* at 48–49. The presiding administrative law judge recognized what counsel for the Kings was trying to do, and, undoubtedly with some exasperation, ruled "[y]ou put your witness on, and we will address her testimony as it comes up. I am not going to limit you. I am not going to create an arbitrary limit at this point. If you want to present your witness, we will address your testimony as presented." *Id.* at 49 (citing to the transcript of the state review proceedings). Notwithstanding this ruling, counsel for the Kings restated his "understanding" of the administrative law judge's ruling, and declined to introduce any new evidence. *Id.* at 49–50. Instead, he chose to rely only on the record of the local level hearing. *Id.*

■ The Kings now characterize this exchange as a deprivation of their right to introduce evidence at the state review proceedings, amounting to a denial of due process. However, from my review of the record, it is clear to me that the Kings did have an opportunity to present their new evidence, but for tactical reasons elected not to do so—undoubtedly in the belief that by characterizing the administrative law judge's ruling as they did, an appeal issue would be created. In any event, even if I were to agree with the Kings' assertions, which I do not, any "error" on the part of the state review board was cured by the decision of this Court to permit the Kings to submit the additional evidence summarized above at pages 754 through 757 above.

■ In light of my independent review of the state review board proceedings, I cannot conclude that the Kings were denied due

---

**18.** That is to say, to first consider whether the proposed IEP and placement of Mark at Cash Valley would provide him with a FAPE, and if

this determination was adverse to the ACSB, to then consider evidence about the WVSDB program.

process as alleged. I further find that the findings and conclusions of that board with respect to the local level proceedings are supported by the evidence of record, and were reached as a result of "regularly conducted" administrative proceedings. Therefore, I find that they are entitled to deference by this Court, and are *prima facie* correct. *Doyle*, 953 F.2d at 100; *Hartmann*, 118 F.3d at 996. I am further mindful of the decision of this Court that "[w]hen both the hearing officer and the state review authority agree on the issues, even greater deference is due." *Sanger*, 916 F.Supp. at 521 (citing *Combs v. Sch. Bd. of Rockingham County* 15 F.3d 357, 361 (4th Cir.1994)).

The remaining issue is to address the additional evidence presented by the parties to this Court, and then, considering it in conjunction with the evidence produced by the local level and state proceedings, determine whether the IEP and Cash Valley placement proposed by the ACSB for Mark afford him with a FAPE. Before doing so, however, it is necessary to address a preliminary matter.

On February 11, 1998, the ACSB filed a motion for reconsideration of this Court's decision to permit the taking of additional evidence (Paper No. 28) and the Kings have replied, (Paper No. 29). The failure of the ACSB to comply with the 10 day filing requirement of Local Rule 105 is undoubtedly explained by the fact that their motion is premised upon the Fourth Circuit's recent decision in *Springer v. Fairfax County Sch. Bd.*, 134 F.3d 659 (4th Cir.1998). Regardless, the ACSB's motion need not detain us long. When the First Report and Recommendation was issued on May 30, 1997, I noted, following a survey of the decisions addressing when it is appropriate for a district court to take additional evidence in an IDEA case, that the Fourth Circuit had not directly addressed this issue. (First Report and Recommendation at 57). Accordingly, my recommendation that the Kings be permitted to introduce additional documentary evidence was based on a review of cases from other circuits, notably *Town of Burlington v. Dep't of Educ.*, 736 F.2d 773 (1st Cir.1984). *Id.* In fashioning the seven principles regarding when additional evidence should be tak-

en, I adopted the approach of the court in *Burlington* that additional evidence should be taken only if it is supplemental, not cumulative. *Id.* at 64. Because I found that the proffer submitted by the Kings would result in the introduction of supplemental information which could not have been introduced during the local and state administrative hearings, I recommended that the additional evidence be allowed.

 In *Springer*, the Fourth Circuit unambiguously adopted the approach taken in *Burlington*, and held that the district court had not erred in refusing to allow the appellants to introduce additional *live* testimony before the district court, when it was clear that this same evidence could have been introduced during the lower level administrative hearings, but was not, for tactical reasons. *Springer*, 134 F.3d at 666–67. The circumstances presented in *Springer* are distinguishable from those in this case, as was explained in great detail at pages 56–69 of the First Report and Recommendation. I accordingly see nothing in *Springer* which would warrant the granting of the ACSB's motion for reconsideration, and I recommend that the ACSB's motion be denied.

 I also recommend that the Court deny the Kings' request for leave to file an additional report regarding a hearing test performed on Mark. (Paper No. 29 at 5). The plaintiffs knew of the test on September 23, 1997, yet did not seek permission from the Court to add it to their proffer of additional evidence until February 19, 1998, well after the deadline for the plaintiffs to submit their additional evidence, and for the defendant to file its rebuttal evidence. To submit additional evidence after these deadlines, and after the issues in the pending motions have been fully briefed—without any explanation why the report could not have been submitted earlier—would unnecessarily prolong the disposition of this case, and would, in the interest of fairness, require the Court to allow the defendant to respond. I do not recommend that this be done. Moreover, even if I were to consider the report, it would not effect the resolution of this case. The report reflects that its results were "similar to those obtained by ABR testing in 1994." (Paper No. 29, Ex. 1 at 1). Thus, there is nothing materially new which this report

adds to the record that was not already known during the administrative hearings at the local and state level. I turn now to the additional evidence which the parties submitted, which was summarized in detail at pages 754 through 764 above.

■ At the outset, the appropriate purpose of the additional evidence must be kept in mind. Manifestly, it is not admissible for purposes of determining whether the WVSDB IEP and placement is *better* than the IEP and placement proposed for Mark by the ACSB, nor is it admissible for the purpose of showing the "ideal" program for Mark, which would allow him to maximize his educational potential to its fullest. Instead, as the cases discussed above at section C.2 clearly show, it is admissible for the limited purpose of allowing the WVSDB IEP and placement to be compared with the ACSB IEP and Cash Valley placement, for the purpose of determining whether the later afford Mark a FAPE, as required by the IDEA. Viewed within its proper context, it is clear that the Kings cannot prevail in their challenge to the ACSB IEP and placement.

■ From my review of the additional evidence submitted by the Kings, summarized above at pages 754 through 757 above, I accept the opinion of Dr. Jensema that Mark has shown improvement while at the WVSDB, although I further find that the opinions of Dr. Rabush and Dr. Howell, summarized at pages 757 through 763 above, persuasively point out the limitations in the weight which must be given to the results of the LAP test administered to Mark by his classroom teacher at WVSDB.[19] Additionally, I find the opinions of Dr. Howell with respect to the similarity between the IEP proposed by the ACSB and that in use at the WVSDB [20] to be particularly instructive, and I accept her conclusion that both of "the IEPs are very similar in their choices of objectives and in their description of Mark's strengths and needs. Both IEP's address the need for 'Total Communication.'" (ACSB Exhibit I.1 at 10). As already noted at pages 756 through 757 above, the primary difference between the methods of educating Mark proposed by the ACSB and used by the WVSDB is that in the former, it is proposed that Mark be taught by special education staff, trained to teach children with mental retardation as well as other learning difficulties, in a class with other students who have mental retardation, while at WVSDB Mark is primarily being taught by deaf educators, in a class of students who are deaf or hearing impaired, but not mentally retarded. As the Fourth Circuit has pointed out in *Hartmann v. Loudoun County,* 118 F.3d 996 (4th Cir.1997), district courts are particularly ill equipped to make determinations of which method of educating disabled children is best, and must rely upon the training and experience of state and local educators, if as in this case, they are shown to be the result of compliance with the substantive and procedural requirements of the IDEA. Thus, it is not for me to choose which philosophy of educating Mark is the best, particularly when the two candidates are in fact so similar in many respects. It is sufficient for me to determine whether the IEP and placement proposed for Mark by the ACSB provides him with a FAPE as required by the IDEA. If they do, then the ACSB must prevail, even though it is the belief of the Kings and their experts that the IEP and placement offered by the WVSDB provides Mark with the "ideal" or "best" education. As next will be seen, it is clear from my independent review of the administrative proceedings at the local and state level, as well as the additional evidence submitted to this Court, that the IEP and placement proposed for Mark by the ACSB would afford him with a FAPE.

■ As already discussed at section C.2 above, an IEP affords a student a FAPE if it provides for personalized instruction and sufficient support services to permit the child to benefit educationally from the instruction. *Doyle,* 953 F.2d at 106. In *Cypress–Fairbanks Indep. Sch. Dist. v. Michael F.,* 118 F.3d 245 (5th Cir.1997), the court identified four factors to evaluate to determine whether an IEP is reasonably calculated to provide educational benefit under the IDEA: (1) whether the program is individualized on the basis of the student's assessment and performance; (2) whether the program is adminis-

---

19. *See* especially pages 758 through 759 and 762 through 763 above.

20. Discussed at page 762 above.

tered in the least restrictive environment; (3) whether services are provided in a coordinated and collaborative method by the key "stakeholders"; and (4) whether positive academic and non-academic benefits are demonstrated. *Id.* at 253. Applying these factors to the present case shows that the IEP and proposed Cash Valley placement afford Mark with a FAPE. First, it is clear from the history of Mark's involvement with the ACSB that the development of the 1995–96 IEP was individualized on the basis of his assessment and prior performance. The testimony of Sheree Witt, the Supervisor of Special Education for ACSB, exhaustively outlined the history and development of Mark's 1995–96 IEP, and explained the development of all of the earlier IEP's and educational programs implemented for Mark, all of which, with the exception of the one at issue in this case, were approved by his parents. (ACSB Exhibit D, at 58–183; Exhibit A, documents 12, 29, 47, 54, 69, 73, 102, and 103).

Second, it is clear that the IEP and placement proposed for Mark by the ACSB is at the Cash Valley Elementary School, close too his house, would be in the least restrictive environment as compared with his education at the WVSDB, located in another state. Indeed this consideration was noted by the dissent to Mark's WVSDB IEP which was submitted by one of the participants in the ARD committee which developed Mark's IEP at the WVSDB, Terry Gruber. *See* ACSB Exhibit K.2 and discussion above at page 33. Third, the services proposed by the ACSB in Mark's IEP were developed in a coordinated and collaborative method by the "key stakeholders" in his education, as can be seen by Exhibit A, documents 102 (the proposed IEP) and 103 (the July 5, 1995 Admission, Review, and Dismissal ("ARD") Committee Report which lists all of the individuals who participated in the meeting which ultimately resulted in the development of the 1995–96 IEP. Included are Mark's parents, as well as his attorney, and multiple officials from the ACSB and Cash Valley Elementary School). Finally, as next will be seen, there is an abundance of evidence from the administrative proceedings in Mark's case which shows that he did, in fact, receive positive academic and non-academic benefits from the IEPs which preceded the proposed 1995–96 IEP.

Ms. Cynthia Erzkus, a certified occupational therapist assistant, testified during the local level hearing that she worked with Mark to lessen his sensory defensiveness so that he could keep his hearing aids in. She testified that after working with Mark for six months, his attention span had improved to 25 minutes, and he was calmer and less aggressive. (Exhibit D, at 186–206). Ms. Janet Mickey, the Allegany County audiologist, testified that she had worked with Mark and the school psychologist, Mr. Cockey, and that they had made progress getting Mark to accept his headphones. She observed that Mark was wearing his hearing aids on a more regular basis. *Id.* at 206–69.

Ms. Catherine Kesner, a speech pathologist, testified that she had observed progress in school year 1995–96 in Mark's willingness to wear his hearing aids longer. She testified that he knew 20 signs, imitated environmental sounds, and understood certain directions. She also testified that his attention had improved, he was more cooperative, his vocabulary had grown from 20 to 50 words in the last year at Cash Valley, that he understood verbal commands, and that he was making choices using sign. She additionally observed that Mark's eye contact had improved, that he could sign to describe his body parts, and that he played appropriately with objects, matched colors, objects, named objects and could combine signs. *Id.* at 270–320.

Ms. Luanne Shircliffe, Mark's classroom teacher, testified that Mark could point to the letters in his name, could vocalize sounds, did "counting colors," did "writing," art projects, math and sensory integration tasks, had improved his self help skills to the point where he could feed himself, was able to wait in line well, sit well, and play well with others, had nearly extinguished hitting, slapping, and pulling the hair of other kids, was doing better with keeping his hearing aids on, was using total communication in class, responded to sounds and music, and that he had doubled the number of signs he could use from 25 to 50. It was her opinion that she was closing the gap between Mark's language and cognitive abilities. *Id.* at 321–47. Finally, Mr. Robert Cockey, the ACSB

school psychologist, testified that he had observed Mark more than 50 times over the preceding three years, and that he was working with Mark on behavior modification so that he would accept use of his headphones. He testified that he had observed progress in Mark's behavior, social skills, task skills, compliance with instructions and his use of language. (Exhibit E at 64–87).

Additionally, the following documents introduced as exhibits at the local level hearing evince improvement by Mark while at Cash Valley: Exhibit A, documents 55, 76, and 95 (ARD committee reports for 1993–95). Although the Kings argue that the testimony of the staff at Cash Valley is unpersuasive with respect to his improvement, because they are employees of the ACSB, reviewing courts have commented on the helpfulness of testimony by the school room teachers and support staff who actually have daily contact with students in IDEA cases. *See, e.g., Heather S. v. State of Wisconsin,* 125 F.3d 1045, 1057 (7th Cir.1997); *Christopher M. v. Corpus Christi Indep. Sch. Dist.,* 933 F.2d 1285, 1292 (5th Cir.1991); *Schreiber v. Ridgewood Bd. of Educ.,* 952 F.Supp. 205, 211 (D.N.J.1997).

Further, as the testimony of Ms. Witt, Dr. Howell and Dr. Rabush show, and as is confirmed by Exhibit A, documents 102 and 103, the development of Mark's 1995–96 IEP resulted in increases in both the personalized instruction and related support services Mark was to receive. Both Dr. Rabush and Dr. Howell expressed the opinion that, had Mark been kept in the Cash Valley program, he would have benefitted from it. (ACSB Exhibits H.2 at 2–3, 10; I.2. at 13).

Although the Kings sincerely believe that the WVSDB is the best place for Mark to be educated, and that this school provides him with the ideal environment to maximize his potential to its fullest, that does not mean that the education proposed for Mark by the ACSB and his placement at Cash Valley would not be appropriate, or would fail to provide him with a FAPE under the IDEA. From my independent review of the entire record in this case, and applying the preponderance of the evidence standard, I find that the Kings have failed to meet their burden of proof in establishing that the IEP and proposed Cash Valley placement would not afford Mark with a FAPE.[21] Accordingly, I recommend that, upon expiration of the time to take exception to this Report and Recommendation, the Court enter an Order:

1. GRANTING the defendant's motion for partial summary judgment (Paper No. 22);

2. DENYING the plaintiffs' motion for summary judgment (Paper No. 23);

3. DENYING the defendant's motion to reconsider the exclusion of additional evidence (Paper No. 28);

4. DENYING the plaintiffs' request for leave to file an additional report (Paper No. 29 at 5); and

5. CLOSING this case.

---

21. The Kings have alleged violations of both the IDEA and Rehabilitation Act. Because these claims are identical, the Kings' Rehabilitation Act claim fails for the same reasons the IDEA claim fails. *Doe v. Alabama State Dep't of Educ.,* 915 F.2d 651, 666 (11th Cir.1990). Counsel for the Kings acknowledged as much during oral argument.