Jonathan HANSON, a minor by his parents and next friends, Robert and Judith HANSON and Robert and Judith Hanson, Plaintiffs,

v.

Eric SMITH, Superintendent, Anne Arundel County Public Schools and Board of Education of Anne Arundel County, Defendants.

No. CIV. H–01–4016.

United States District Court, D. Maryland.

Aug. 9, 2002.

Brian Keith Gruber, Law Office, Chevy Chase, MD, for Plaintiffs.

Eric Charles Brousaides, Reese and Carney LLP, Columbia, MD, for Defendants.

**MEMORANDUM OPINION**

ALEXANDER HARVEY, II, Senior District Judge.

This civil action has been brought by the parents of a child with learning disabilities. Suit has been instituted under the Individuals With Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et. seq.* (1997) and the Rehabilitation Act of 1973 ("Section 504"), 29 U.S.C. § 794.[1]

Jonathan Hanson ("Jonathan"), a minor, and his parents Robert Hanson and Judith Hanson ("the Hansons") have here sued the Board of Education of Anne Arundel County and its Superintendent. The Hansons allege, *inter alia,* that defendants failed to provide Jonathan with a "free appropriate public education" for the 2001–02 school year and that they violated the IDEA in various other respects. In this suit, the Hansons have challenged the ruling of Administrative Law Judge J. Bernard McClellan (the "ALJ") which affirmed the educational placement for Jonathan for the 2001–02 school year proposed by the Board of Education for Anne Arundel County Public Schools (hereinafter "AACPS").

Before the 2001–02 school year, Jonathan had been placed in a non-public special education school serving children with language based and learning disabilities pursuant to an Individual Education Program ("IEP") approved by AACPS. As a result of a review of his status in July of 2001, a public placement was proposed. In their seven-count complaint, the Hansons challenge that placement, contending that procedural and substantive errors were committed by the ALJ.

Pursuant to a Scheduling Order entered by the Court, the parties have engaged in

---

1. The complaint also refers to 42 U.S.C. § 1983 and to Md.Code Ann., Education § 8–413. Counsel agree, however, that this is essentially a suit seeking relief under the IDEA.

discovery. Presently pending in the case is defendants' motion for summary judgment and plaintiffs' cross-motion for summary judgment. Memoranda and numerous exhibits have been submitted by the parties in support of and in opposition to these motions, including a transcript of the hearing held before the ALJ and a copy of his Decision of December 13, 2001. At a status conference held with counsel, the Court determined that the issues in this case had been fully developed by the parties' submissions and that no hearing was necessary for a decision on the pending motions. *See* Local Rule 105.6. For the reasons stated herein, defendants' motion for summary judgment will be granted, and plaintiffs' cross-motion for summary judgment will be denied.

I

*Background Facts and Prior Proceedings*

Jonathan is twelve years old and resides with his parents in Anne Arundel County. Jonathan has multiple special education needs, including significant language based deficiencies, speech articulation deficiencies, attention-deficit hyperactivity disorder and poor memory skills. As a result, he requires special education and related services. He has attended since the 1997–98 school year and continues to attend the Summit School, a private school in Anne Arundel County. The Summit School is fully accredited by the State Department of Education and serves primarily students with language and learning disabilities. AACPS has funded Jonathan's attendance at the Summit School since the 1998–99 school year. In January of 2001, AACPS began the process of re-evaluating Jonathan as mandated by the IDEA. Pursuant to this re-evaluation, AACPS conducted an academic assessment, speech and language assessment and class room observation of Jonathan. However, no updated psycho-logical examination of Jonathan was performed.

AACPS completed its evaluation in March of 2001, and the results were discussed with the Hansons at a meeting on March 12, 2001. AACPS did not because of time constraints adopt at that time a new IEP for Jonathan for the 2001–02 school year. In the Spring of 2001, the Hansons learned that AACPS had developed a new special education public program housed at its Severna Park Middle School and known as the "Learning Academy". This school had been designed to emulate the approach of the Summit School and had been developed to eliminate the need of AACPS to fund certain children in non-public schools. The Hansons were told in the Spring of 2001 that there was a strong possibility that AACPS would propose that Jonathan attend the Learning Academy even though his IEP had not yet been developed. The Hansons requested that they be permitted to visit and observe the Learning Academy in advance of the IEP review and placement meeting. However, arrangements were never made during the school year for them to attend and observe school sessions at the Learning Academy.

The annual IEP review meeting for Jonathan's placement was eventually held on July 2, 2001. At this meeting, which was attended by the Hansons, an IEP was developed for Jonathan for 2001–02 containing substantially similar goals, objectives, accommodations, modifications and the same level of speech-language intervention as the IEP in place for him for the 2000–01 school year. Pursuant to the 2000–01 IEP, AACPS had recommended the placement of Jonathan in the Summit School because it had determined that the recommended accommodations and instructional component modifications could not be delivered in a public school setting.

However, for the 2001–02 school year the AACPS system recommended a change in the placement of Jonathan to the Learning Academy, with his participation in a regular-education setting for one elective and for certain other non-academic periods. The Hansons objected to this change in placement, claiming that there was an absence of data that might reasonably indicate that Jonathan would receive an educational benefit from inclusion in regular-education classes, so-called "mainstreaming".[2] The Hansons were concerned that Jonathan was not ready to participate in a mainstream school setting and that his educational advancement might be jeopardized.

On August 14, 2001, the Hansons requested that, pursuant to Maryland law, an administrative hearing be held to review the evaluation of Jonathan by AACPS and his placement in the Learning Academy. A due process hearing was held on November 1,2 and 16, 2001 before Administrative Law Judge J. Bernard McClellan of the Maryland Office of Administrative Hearings. Exhibits were submitted, and the ALJ heard testimony on several substantive issues, namely whether the level of service and the proposed placement were appropriate for Jonathan, and whether the school system had failed to provide him with a free, appropriate, public education ("FAPE"). Other exhibits and testimony received by the ALJ related to procedural issues, namely, (1) the alleged failure of the school system to conduct a psychological examination of Jonathan as a part of its annual re-evaluation, (2) the school system's alleged determination of placement prior to the formulation of the IEP, and (3) the school system's alleged failure to provide an opportunity for the Hansons to be true partners in the edu-

cational planning process by denying them the opportunity to visit and observe the Learning Academy prior to adoption of the new IEP.

In his Decision of December 17, 2001, the ALJ held that the school system's proposed IEP for Jonathan and his placement in the Learning Academy for the 2001–02 school year were appropriate. He further held that no procedural violations had occurred.

On December 21, 2001, plaintiffs filed this civil action in this Court, challenging the adverse decision of the ALJ. Jonathan had meanwhile returned to the Summit School for the 2001–02 school year. Because the Hansons have challenged the ALJ's decision in this Court, AACPS continues to fund the cost of Jonathan's attendance at the Summit School.

## II

### Applicable Principles of Law

■ It is well established that a party moving for summary judgment bears the burden of showing the absence of any genuine issue of material fact and that the movant is entitled to judgment as a matter of law. *Barwick v. Celotex Corp.*, 736 F.2d 946, 958 (4th Cir.1984). When a complaint is filed in federal court under the IDEA challenging the decision of a state ALJ, the complaint is subject to the Federal Rules of Civil Procedure, including the well settled rules of summary judgment. *Cavanagh v. Grasmick*, 75 F.Supp.2d 446, 457 (D.Md.1999). Nevertheless, what in other cases is traditionally understood as a Rule 56 motion for summary judgment may more aptly be described in the IDEA context as a motion for summary adjudication, wherein the district court is required

---

2. Educating a handicapped child in regular classrooms with non-handicapped children is known as "mainstreaming." *Barnett v. Fair-* *fax County Sch. Bd.*, 927 F.2d 146, 150 (4th Cir.1991).

to conduct a *de novo* review of the administrative record while giving "due weight" to the administrative findings made below. *Id.; see also Doyle v. Arlington County Sch. Bd.*, 953 F.2d 100, 103 (4th Cir.1991), *aff'd* 39 F.3d 1176 (4th Cir.1994). Courts have agreed that summary judgment is the most pragmatic procedural mechanism for resolving IDEA cases. *Steinberg v. Weast*, 132 F.Supp.2d 343, 345 (D.Md.2001) (citing *King v. Board of Educ. of Allegany County*, 999 F.Supp. 750, 764 (D.Md. 1998)).

■ The IDEA statute was originally named the Education of the Handicapped Act[3] and was enacted by Congress to ensure that all children with disabilities had access to a "free appropriate public education." *Gadsby v. Grasmick*, 109 F.3d 940, 942 (4th Cir.1997). Congress sought to ensure this goal by providing federal money to states and local agencies to assist in the education of handicapped children. *Board of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 179, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982). "The term 'free appropriate public education' means special education and related services that(A) have been provided at public expense, under public supervision and direction, and without charge; (B) meet the standards of the State educational agency; (C) include an appropriate preschool, elementary, or secondary school education in the State involved; and (D) are provided in conformity with the individualized education program required under section 1414(d) of this title." 20 U.S.C. 1401(8).

■ An individualized education program or IEP[4] is the centerpiece of a FAPE and is a collaboratively developed plan for a disabled child's education. *Cav-*

*anagh*, 75 F.Supp.2d at 456. The IEP is supposed to be the joint product of discussions among the child's parents, teachers, and local school officials and must specify goals and short-term objectives for the child, any related services, and the criteria and evaluation procedures that will be used. *Sanger v. Montgomery County Bd. of Educ.*, 916 F.Supp. 518, 520 (D.Md. 1996). The statute contemplates parental participation in the development of the IEP. *Justin G. v. Board of Educ. of Montgomery County*, 148 F.Supp.2d 576, 582 (D.Md.2001).

■ The IEP must include a statement of the child's annual educational goals, the specific educational services to be provided, and the projected date for initiation and duration of such services. *Id.* at 582. An IEP must be reviewed and, if appropriate, revised at least once a year. *Rowley*, 458 U.S. at 182, 102 S.Ct. 3034. Once a procedurally proper IEP has been formulated, a reviewing court should be reluctant to second-guess the judgment of education professionals. *Tice v. Botetourt County Sch. Bd.*, 908 F.2d 1200, 1207 (4th Cir.1990); *Justin G.*, 148 F.Supp.2d at 588. Courts have considered four factors in determining if an IEP is reasonably calculated to provide educational benefit, including: (1) whether the program is individualized on the basis of the student's assessment and performance; (2) whether the program is administered in the least restrictive environment; (3) whether services are provided in a coordinated and collaborative method by the key "stakeholders" in the child's education; and (4) whether positive academic and non-academic benefits are dem-

---

**3.** The title of the Act was changed from the "Education of the Handicapped Act" to the "Individuals with Disabilities Education Act" in 1990. *Gadsby*, 109 F.3d at 942, n. 1.

**4.** Some courts have instead referred to this program as an "Individualized Education Plan."

onstrated by the program. *King*, 999 F.Supp. at 767–68.

There is no substantive standard set forth in the IDEA regarding the level of education to be provided, nor does the statute require that local educators must maximize the potential of disabled children or provide a guaranty of any particular outcome for the child. *King*, 999 F.Supp. at 767. "[T]he intent of the Act was more to open the door of public education to handicapped children on appropriate terms than to guarantee any particular level of education once inside." *Rowley*, 458 U.S. at 192, 102 S.Ct. 3034. In *Rowley*, the Supreme Court concluded "that the 'basic floor of opportunity' provided by the Act consists of access to specialized instruction and related services which are individually designed to provide educational benefit to the handicapped child." *Id.* at 201, 102 S.Ct. 3034. All that is required of the school system by the IDEA is that the education provided be sufficient to confer some educational benefit to the child. *King*, 999 F.Supp. at 767.

The IDEA requires that "to the maximum extent appropriate" disabled children should be mainstreamed, that is educated with children who are not handicapped. *Hartmann v. Loudoun County Bd. of Educ.*, 118 F.3d 996, 1000 (4th Cir. 1997). Mainstreaming implicates the obligation of public officials to place the child in school programs with nondisabled children whenever possible. *Justin G.*, 148 F.Supp.2d at 581, n. 3. Despite the stated statutory preference for mainstreaming, the Supreme Court in *Rowley* noted (458 U.S. at 181 n. 4, 102 S.Ct. 3034):

> Congress recognized that regular classrooms simply would not be a suitable setting for the education of many handicapped children. The Act expressly acknowledges that "the nature or severity of the handicap [may be] such that edu-

cation in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." § 1412(5). The Act thus provides for the education of some handicapped children in separate classes or institutional settings. § 1413(a)(4).

If a school system cannot meet its burden of providing an appropriate education in a public school setting, it must then fund the cost of a private school. In a case where the segregated facility is considered superior, the court should determine whether the services which make the placement superior could be feasibly provided in a non-segregated setting. *DeVries v. Fairfax County Sch. Bd.*, 882 F.2d 876, 879 (4th Cir.1989) (citing *Roncker v. Walter*, 700 F.2d 1058, 1063 (6th Cir.), *cert denied* 464 U.S. 864, 104 S.Ct. 196, 78 L.Ed.2d 171 (1983)). If they can, the placement in the segregated school would be inappropriate under the Act. *Id.*

In *DeVries*, the Court construed the Act's language as obviously indicating a strong Congressional preference for mainstreaming, but noted that such may not be possible in all cases. *Id.* at 878. Segregated facilities may be appropriate where the child would not benefit from mainstreaming, where the marginal benefits provided by mainstreaming would be far outweighed by benefits gained from services that could not be provided in a non-segregated setting, or where the child would be a disruptive force in a non-segregated setting. *Id.* at 879.

A school system should not make placement decisions on the basis of financial considerations alone, although the term "appropriate" does not mean the best possible education that a school could provide if given access to unlimited funds. *Barnett v. Fairfax County Sch. Bd.*, 927 F.2d 146, 154 (4th Cir.1991). It has thus been recognized that courts are permitted

to consider economic factors along with the needs of the child in determining whether a placement meets the requirements of the IDEA. *Id.*

Parents of handicapped children who are not satisfied with their child's IEP have a right to an "impartial due process hearing" before a hearing officer and a right to an appeal to the state educational agency. *DeVries,* 882 F.2d at 877 (citing former 20 U.S.C. § 1415(b)(2) and (e)(2)).[5] A party aggrieved by the result of an administrative determination can then seek review in a state or federal court. Although there is a split in the circuits on the issue of whether the school board or the parents of the disabled child has the burden of proof in IDEA cases, the Fourth Circuit has held that the burden of proof in such a case is on the party challenging the results of a state administrative proceeding. *King,* 999 F.Supp. at 768 (citations omitted).

■ Courts, in determining procedural compliance with the IDEA, employ a two part inquiry. "First, has the State complied with the procedures set forth in the Act? And second, is the individualized educational program developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits? If these requirements are met, the State has complied with the obligations imposed by Congress and the courts can require no more." *Rowley,* 458 U.S. at 206–07, 102 S.Ct. 3034.

In deciding a case brought under the IDEA, a court should look at the administrative record and may hear additional evidence at the request of the parties. *Justin G.,* 148 F.Supp.2d at 582; *see* 20 U.S.C. § 1415(i)(2)(B). While giving due weight to the results of the state administrative proceeding, the court is to make an independent decision based on the preponderance of the evidence as to whether the

school provided the child with a FAPE. *Id.* The findings made in a state administrative decision are to be considered *prima facie* correct. *Id.* at 583. In *Rowley,* the Supreme Court warned that reviewing courts had to be careful to avoid imposing their own views of preferable educational methods on local and state educators who are primarily charged with the responsibility of educating children, because courts lack the specialized knowledge and experience needed to resolve difficult questions of educational policy. *See King,* 999 F.Supp. at 765–66.

Applying the principles of these authorities to the facts of record in this case, this Court finds and concludes that defendants' motion for summary judgment must be granted and that plaintiffs' cross-motion for summary judgment must be denied.

### III

### *Discussion*

In support of their cross-motion for summary judgment, plaintiffs contend that AACPS violated the IDEA in four different ways, three of which are procedural and one of which is substantive. First they argue that, in failing to conduct a psychological evaluation of Jonathan, the school system did not assess the student in all areas of suspected disability as a part of the required annual re-evaluation plan. Second, plaintiffs claim that Jonathan's placement was predetermined by AACPS in advance of complete development of the IEP. Third, they contend that AACPS prevented the Hansons as parents from being equal partners in the IEP process by denying or complicating their opportunity to observe the proposed public school program at the Learning Academy. Fourth, as a substantive violation, they argue that the proposed placement of their child at

---

**5.** As revised, the applicable provisions are § 1415(f) and (g).

the Learning Academy was not appropriate. ALJ McClellan, after conducting a three day evidentiary hearing, found from the evidence presented that AACPS had not violated the IDEA in any one of these four ways. In this suit, the Hansons have challenged the determinations made by the ALJ in his Decision of December 17, 2001.

(a)

*Failure to Conduct a Psychological Examination*

As a part of the process for the completion of an IEP for Jonathan for the 2001–02 school year, a Student Evaluation Plan was developed. An Assessment Report was completed in the academic areas of basic reading, reading comprehension, math calculation, math reasoning and written expression. Although, in addition, an observation of Jonathan was conducted, there was no psychological evaluation of him undertaken as a part of the process. Jonathan's last psychological evaluation was performed by a private provider in August, 1997, when Jonathan was 7 years of age. The last psychological evaluation performed on Jonathan by the school system was in May, 1996. In his Decision, the ALJ determined that the school system was not required to conduct a current psychological evaluation as part of Jonathan's triennial review, and he further found that there was in any event no resulting harm.

The IDEA requires a child to be re-evaluated at least once every three years. 20 U.S.C. § 1414(a)(2). The Hansons argue that 20 U.S.C. § 1414(c) requires the school system to provide an updated psychological examination as a part of such review. Plaintiffs mis-read the statute. Section 1414(c) does not require re-testing in all areas of suspected disability. Rather, the statute merely requires the review of existing data, and, with the input of the parents, a determination of what additional data, if any, is needed to confirm the continued existence of the child's disability. There is, however, no statutory mandate requiring in all cases a psychological re-evaluation.

Plaintiffs rely in particular on § 1414(c)(4) which provides that if the IEP team concludes that no additional information is needed to determine whether the student continues to be a child with a disability, then the local education agency shall notify the parents of the determination and the reasoning behind it and inform the parents of their right to request an assessment to determine if the child continues to be a child with a disability. Plaintiffs assert that they were never specifically informed that they could have requested psychological testing. However, there is in this case no question that the parties do not dispute that Jonathan is and remains a child with a disability. Moreover, it was not determined by AACPS in this case that no additional data at all was needed. Rather, the determination was that Jonathan should be re-tested in certain areas, but that it was not necessary to test him in other areas. Thus, since additional information in certain areas was deemed necessary but not updated psychological data, the school system was not required to comply with § 1414(c)(4).

As part of the re-evaluation process which led to the new IEP, several meetings were held, including a January 29, 2001 meeting attended by Jonathan's parents, by representatives of AACPS, and by representatives of the Summit School. A later meeting with the same participants was held on March 12, 2001. Neither the Hansons nor any one else proposed at those meetings that an updated psychological examination was necessary. The only time that the question of updated psychological testing arose was at the end of the July 2, 2001 meeting when, after there had been a determination by AACPS that Jon-

athan should be placed at the Learning Academy, the Hansons learned that no such testing had been done and requested that there be psychological testing. The record here does not indicate that any request for this testing was made prior to the final placement decision.

The only witness to testify that updated psychological testing was necessary was Dr. Terry Edelstein. She did not, however, participate in the re-evaluation, and her only connection to the case arose when she testified at the administrative hearing. As Nancy Hendee, the public school psychologist, testified, additional psychological testing was never requested by the parents nor by staff representatives from the Summit School. Dr. Paula McCormick, the public school liaison representative and a participant in the evaluation and IEP process, testified that in her opinion updated psychological testing for Jonathan was not necessary.

On the record here, this Court concludes that no procedural violation occurred when a psychological re-evaluation was not undertaken as a part of Jonathan's triennial review. As the Supreme Court cautioned in *Rowley,* courts should be careful not to impose their own views of preferable educational methods on local and state educators. *Rowley,* 458 U.S. at 207, 102 S.Ct. 3034. This Court is satisfied that the ALJ, who heard all of the testimony on the issue, did nor err in concluding that it was not necessary to conduct a psychological re-evaluation of Jonathan.

■■■ In any event, there needs to be harm to the child as the result of a procedural violation in order that an otherwise proper IEP decision may be invalidated by a court. To the extent that a procedural violation does not actually interfere with the provision of a free appropriate public education, such a violation is not sufficient to support a finding that an agency failed to provide a FAPE. *Gadsby,* 109 F.3d at

956. Some witnesses did testify before the ALJ that Jonathan would suffer harm by being placed in a less restrictive setting, while others testified that Jonathan would benefit from the mainstream setting proposed. As noted, besides representatives of the Summit School, Dr. Edelstein testified on behalf of the plaintiffs. However, when questioned by counsel for AACPS, she stated that she was speculating when she gave an opinion, as an expert witness in psychology, regarding Jonathan's ability to handle a mainstream setting.

Following its review of the record here, this Court concludes, as did the ALJ, that AACPS was not required under the circumstances to conduct a current psychological evaluation of Jonathan as a part of his annual evaluation, and that even if it were, the decision of AACPS not to do so would not support a finding that it had failed to provide him a FAPE.

(b)

*Predetermination of Placement*

■■■ The plaintiffs also argue that AACPS predetermined that Jonathan should be placed in the Learning Academy, in advance of the completion of the IEP. The ALJ concluded in his Decision that AACPS did not make a predetermination of placement in advance of complete development of the IEP. In making this determination, the ALJ found that there was credible testimony that the proposed change in placement was not predetermined, and concluded that placement in the Learning Academy was merely considered as one of several different programs that should be considered.

■■■ In *Spielberg v. Henrico County Pub. Sch.,* 853 F.2d 256 (4th Cir.1988), the Fourth Circuit held that the defendant committed a procedural violation when the school board predetermined the placement and then developed an IEP to carry out its

decision. The Court found a violation because the IDEA requires placement to be based on the IEP and not the reverse. *Id.* at 259. As explained in *Doyle v. Arlington County Sch. Bd.*, 806 F.Supp. 1253, 1262 (E.D.Va.1992), if the school system has already fully made up its mind before the parents ever get involved, it has denied them the opportunity for any meaningful input. The Court in *Doyle* went on to state that the holding of *Spielberg* required the school board to come to the table with an "open mind," but did not require them to come to the IEP table with a "blank mind." *Id.* Thus, while a school system must not finalize its placement decision before an IEP meeting, it can and should have given some thought to that placement. *Id.*

Plaintiffs contend that this case is analogous to *Spielberg*, where the Court found that the school board had committed a procedural violation by predetermining the placement and ordered the placement of the child to be continued in the private school setting. According to plaintiffs, the Learning Academy was developed merely to save money. They also maintain that Jonathan was one of the students targeted as eligible for the new school and that the school system proposed the placement of Jonathan in the Learning Academy at the very first opportunity to do so. According to the plaintiffs, Jonathan's educational needs had not changed since the previous 2000–01 IEP. In the absence of any such change, plaintiffs argue that there was no indication that he was ready for transition into a less restrictive environment.

After reviewing the evidence here and making an independent determination while giving due weight to the findings of the ALJ who heard testimony on the subject, this Court concludes that the placement of Jonathan at the Learning Academy was not predetermined in advance of the completion of the IEP. Competent evidence does not exist in the record here indicating that placement was predetermined. There was credible evidence before the ALJ that the school board came to the IEP meetings with an open mind. Notes taken by participants in the July 2, 2001 meeting indicate that, before the Learning Academy was recommended, several options were discussed and considered, including the Summit School, the Learning Academy, and a program at Bates Middle School.

Dr. McCormick testified that the procedure used in deciding where a student would be placed is first to determine whether the student's home school could implement the IEP. If the home school cannot implement the IEP, then the next step is to look at the regional school and then finally a private school. In this case, Bates Middle School was the home school, which was ruled out. The Learning Academy was then determined to be appropriate. Linda Donahue, a non-public tuition specialist, testified that placement was not predetermined in this case, but rather that all options were considered, including the home, regional, and private school settings. Nancy Hendee, a school psychologist, also testified that placement was not predetermined.

On the record here, this Court is satisfied that the school board did not change Jonathan's placement at the first opportunity merely in order save money. Moreover, the evidence indicates that AACP did not predetermine that Jonathan should be placed in the Learning Academy before the new IEP was completed. Accordingly, no procedural violation occurred because of the timing of the placement decision.

### (c)
### *Failure to Allow Participation by the Parents*

██ The plaintiffs also argue that AACPS committed a procedural violation

by denying the Hansons the opportunity to fully participate in the IEP when they were not allowed to observe the Learning Academy. The ALJ rejected this contention. As noted by the parties, the IDEA statute contemplates parental participation in the IEP. *Justin G.*, 148 F.Supp.2d at 582. However, in this case the Hansons were present at all the meetings and were thereby given a full opportunity to participate in the formulation of the IEP.

The fact that the Hansons were not able to visit and observe the Learning Academy is hardly a procedural violation. There is no language in the IDEA requiring a school board to allow parents to visit the school of the proposed placement. Rather, the statute requires merely that the parents be active partners in the process. Plaintiffs have cited no case holding that under the IDEA parents must be permitted to observe the proposed placement prior to an IEP decision in order to be able to fully participate in the process. The Learning Academy was fully described to the parents, and representatives of the Summit School, who testified at the hearing on behalf of the parents and who participated in the process, had observed the Learning Academy.

Before the end of the school year, the Hansons were told that once the IEP was formally adopted, they would be given an opportunity to observe the Learning Academy. Because of delays attributable to the Hansons themselves, the final IEP meeting of July 2, 2001 was not held until after school had closed for the summer, and the opportunity for the Hansons to visit was no longer available. As noted, the Hansons attended and participated in discussions at the March 12, 2001 meeting. The annual IEP meeting was then scheduled for April 9, 2001. This was canceled by the Hansons on April 5. The IEP meeting was then rescheduled for May 14, but that very morning, the Hansons once again

canceled the meeting. Two additional dates were proposed for the meeting before the end of the Learning Academy's school year, namely May 24 and June 4. Neither of these dates was acceptable to the Hansons. After several additional alternative dates were proposed, the Hansons finally accepted July 2, 2001 for the annual IEP meeting which was then in fact held on that date. Had they accepted one of the earlier dates, they would have had an opportunity to observe the Learning Academy after the annual IEP meeting at a time when the school was still in session.

Under the circumstances here, the Court is satisfied that no procedural violation occurred because of the inability of Jonathan's parents to view the Learning Academy until after the IEP was finalized. Moreover, there was credible evidence before the ALJ that the school board had valid reasons for earlier limiting any observation by the Hansons of the Learning Academy, namely their concern for the disruption of students currently in the program.

After examining the exhibits and reviewing the transcripts, this Court concludes that the Hansons were given the opportunity to meaningfully participate in the development of Jonathan's IEP and that no procedural violation occurred because they did not visit and observe the Learning Academy.

(d)

*Appropriateness of the Learning Academy*

■ Finally, the plaintiffs challenge the substantive appropriateness of Jonathan's placement in the Learning Academy. Plaintiffs rely on the testimony of Susan Schuck, who had been Jonathan's fifth grade teacher, on that of Dr. Joan Mele–McCarthy, a speech language pathologist from the Summit School, and on that of Dr. Paula McCormick, the Summit

School public-school liaison. According to plaintiffs, these are individuals who had firsthand knowledge of Jonathan's abilities and who observed Jonathan in the classroom. All three of these individuals testified that Jonathan would have difficulty in a less restrictive environment. However, as has already been noted, the school board is required merely to provide Jonathan with a FAPE. The statute does not contain language setting a substantive standard of the level of the education to be provided, nor does it require that every child's potential be maximized. *King,* 999 F.Supp. at 767. Moreover, the IDEA does not guarantee any particular level of education once a placement has occurred. *Rowley,* 458 U.S. at 192, 102 S.Ct. 3034. All that is required is that the disabled child benefit educationally from the program. *King,* 999 F.Supp. at 767.

■ On the record here, this Court concludes that the Learning Academy provided Jonathan with access to specialized instruction and related services which were designed to provide educational benefit. *Rowley,* 458 U.S. at 192, 102 S.Ct. 3034. As the court said in *King,* the insistence of parents that a non-public school setting is more appropriate does not establish the inappropriateness of the public school, even if the child would have benefitted more in the private setting. *King,* 999 F.Supp. at 767.

The Hansons and the witnesses who testified on their behalf at the due process hearing before the ALJ objected principally to the "mainstreaming" of Jonathan. But the mainstreaming to which Jonathan would be subjected at the Learning Academy was minimal. Had he attended the Learning Academy during the 2001–02 school year, he would have been one of only five students in the classroom.[6] His

core academic instruction would occur daily in that classroom, which was staffed by a full-time certified special education teacher and a full time college-level instructional aide. In addition, a speech language pathologist and a school psychologist were assigned to the classroom. Under the proposed program, Jonathan would be mainstreamed into an elective regular education class for only one period a day. He would also interact with non-handicapped peers during lunch and assemblies.

Plaintiffs argue that the *status quo* whereby Jonathan had been attending the Summit School should have been maintained. In advancing this argument, plaintiffs overlook the IDEA requirement that disabled children should be mainstreamed "to the maximum extent appropriate." *Hartmann,* 118 F.3d at 1000. There was no mainstreaming at the Summit School, and AACPS followed the IDEA mandate and quite appropriately determined that Jonathan would benefit from the minimal mainstreaming to which he would be subjected at the Learning Academy.

At the hearing before the ALJ, Susan Schuck stated that she was not testifying that Jonathan's academic needs could not be met in the self-contained class room at the Learning Academy, but rather that his problem would be with focusing in the less restrictive environment which he would encounter outside of the classroom in the larger school. However, Ellen McGinn a speech language pathologist employed at the Learning Academy, testified that there would be procedures in place to assist Jonathan in his mainstream class and that Jonathan would benefit from the modest mainstreaming experience. Nancy Hendee, the school psychologist, also testified that

---

6. At the Summit School, there were 8 students in Jonathan's math class and 13 in his science, social studies and English classes.

Jonathan would profit from mainstreaming. His academic achievement while he was enrolled at the Summit School had been slow, inconsistent and limited. Linda Donahue, the non-public tuition specialist employed by the County and Jonathan's case manger, testified that Jonathan would receive an educational benefit from the Learning Academy.

AACPS had developed the Learning Academy in order to emulate the methods and approach of the Summit School and to alleviate the need to fund children in private school. A school board is entitled to take into account financial considerations when determining placement. *Barnett,* 927 F.2d at 154. Linda Donahue testified that AACPS developed the Learning Academy in order to comply with the IDEA. According to her, AACPS satisfied the IDEA requirement that it consider the least restrictive environment by first looking at the home public school, then at a regional public school, and finally at a private school if the child's needs could not be met in any public school. She testified that the Learning Academy had been developed to meet the needs of a child like Jonathan in a public school setting.

Following its review of the testimony and other evidence before the ALJ, this Court concludes that the Learning Academy is under the IDEA an appropriate placement for Jonathan.

## IV

### *Conclusion*

For the reasons stated herein, the Court will grant defendants' motion for summary judgment and deny plaintiffs' cross-motion for summary judgment. An appropriate Order will be entered by the Court.